[Civ. No. 36. Fourth Appellate District.—December 16, 1929.]

In the Matter of the Estate and Guardianship of KATHERINE DES GRANGES (an Insane Person). ALFRED A. APPLING, Petitioner, v. J. D. DES GRANGES, Appellant.

Allen & Lyon for Appellant.

Alfred A. Appling, *in pro. per.,* and S. M. Davis for Respondent.

BARNARD, J.—Katherine des Granges was declared insane by the County Court of Brown County, Wisconsin, on October 12, 1911. Thereafter, in a proceeding in the Superior Court of Orange County, California, the appellant herein was appointed guardian of the person and estate of said Katherine des Granges, and is still acting as such guardian. On July 1, 1926, the County Court of Brown County, Wisconsin, entered a judgment and decree declaring Katherine des Granges to be sane. Thereafter the respondent herein, as friend and attorney for said Katherine des Granges, filed a petition alleging that the said Katherine des Granges is now sane and competent, and praying that the court order an investigation into her mental condition,

to the end that she be restored to capacity. The cause went to trial upon the issues presented by this petition and an answer thereto. Judgment was entered in favor of the petitioner, and the guardian has appealed.

The court found "that the said Katherine des Granges is now sane and of sound mind and fully capable of caring for herself and managing her property." The only question involved in this appeal is whether or not the evidence sustains this finding. The ward was not present at the hearing, being then in the state of Wisconsin, and all of the evidence introduced by the petitioner was in the form of depositions. The respondent sets forth in his brief, his own summary of the evidence introduced, and relied on as being sufficient to sustain the finding in question, as follows:

"Summarized the Witnesses Testify as Follows:

"1. Dr. A. O. Olmsted—'She is sane.'

"2. Dr R. M. Burdon—'She appeared to be normal. Is sane.'

"3. Lorraine Ross, Nurse—'She was exceptionally bright. Is sane.'

"4. Dora Brown—'She was sane.'

"5. Arthur Brown—'She was well enough to be paroled. She is sane. She is all right.'

"6. Jacob Landenklos—'She is all right as near as I can tell.'

"7. Emma Luecke—'I think she is sane.'

"8. Charles F. Luecke—'She conversed normally. I judged her sane.'

"9. Minnie Schoen—'She is sane. I have never seen anything wrong with her. Her memory is good.'

"10. L. M. Schoen—'I regard her sane. I never saw anything wrong with the woman.'

"11. Harrie des Granges—'She appears to be intelligent. She acted normally.' "

While the parties testified as stated, it is necessary to consider their testimony in the light of the questions asked of them, and the context. Dr. Olmsted was asked as to whether he had examined the ward and whether he had formed an opinion as to whether she was sane. Also, the following: "Q. State whether or not you and Dr. Burdon did determine her sanity? A. We certified that we be-

lieved she was sane." Dr. Burdon was asked as to his examinations of and conversations with the ward, including: "Q. When Dr. Olmsted and yourself were appointed to examine her, the purpose of your examination was to determine sanity or insanity? A. Yes it was. Q. And as a result of the examination of Dr. Olmsted and yourself, you reported a finding of sanity? A. Yes." Lorraine Ross was asked for a definite statement as to whether she regarded the ward as sane or insane. As a reason for her opinion she testified: "My opinion of her is that she was exceptionally bright because her memory was so good. She could memorize—She was in a room with other people, and she could tell you about the people that came in, their names and things they did, that I knew were done, things like that. . . . Well, she talked about things that happened in her childhood days, and about different things that she had read in papers and that we had read and knew that they were true." Dora Brown was asked if she had formed an opinion as to whether or not the ward was sane. Arthur Brown was asked the same question. Jacob Landenklos testified: "Q. From your acquaintance with her, knowledge of her, examination or observation, you have made an opinion, have you formed an opinion as to whether or not she is sane? A. Whenever I see her she is all right as near as I can tell. I have kept a close watch all the time, as close as I could." Emma Leucke was asked only as to her opinion on the ward's sanity, and the reasons for it. Charles F. Luecke was asked for his opinion on her sanity. He testified: "Q. What were her actions as to whether she was a woman of normal mind or otherwise? A. She behaved herself, acted normal, obeyed orders, and did what little work she had to do. Q. How did she converse with you? Did she converse readily and normally? A. She did during all the conversation I had with her." Minnie Schoen, on being asked her opinion as to her sanity, and the reasons therefor, testified: "She has been with me nine months and I have never seen anything wrong with her. She understands everything about what she reads and her memory is good about years ago. I see nothing wrong with her." Harrie des Granges testified as follows: "Q. From your visit with her back there in September, state whether or not in your opinion that your mother is sane or insane?

A. As far as I could see she was sane but I do not feel she was competent to handle business; her memory is very good on things that happened years ago, but not very good on present day things.''

While the evidence is sufficient to sustain the findings that the ward is sane, that is, of sound mind, we think it is not sufficient to sustain the other essential findings that she is ''fully capable of caring for herself and managing her property.'' There is a difference between insanity and mental incompetency to handle one's property. ''The words, 'insane' and 'incompetent' are not necessarily convertible terms, as a person may be incompetent by reason of insanity or from some other cause.'' (14 Cal. Jur. 333.) ''A weak mind may be sound, and a strong mind unsound.'' (14 Cal. Jur. 335, and cases cited.)

This action was brought under section 1766 of the Code of Civil Procedure. This section relates to the legal restoration to capacity of a person whose capacity to act in matters of business has been legally taken away through the procedure provided for by other sections of the same article of this code. Section 1763, providing the manner of beginning such a guardianship proceeding, reads in part: ''When it is represented . . . that any person is insane, *or from any cause mentally incompetent to manage his property.*'' Section 1764 provides what must be found by the court before a guardian is appointed. The essential thing to be found is that ''the person in question is incapable of taking care of himself and managing his property.'' Sections 1764 and 1767 together provide a test by which the condition of the alleged incompetent is to be measured. (*In re Cassidy,* 95 Cal. App. 641 [273 Pac. 69].) If, measured by the test, the person in question is found to be incompetent a guardian is appointed, regardless of whether the incompetency is due to insanity or to some other cause. (*Matter of Coburn,* 165 Cal. 202 [131 Pac. 352].) It being necessary only to prove such incompetency to secure the appointment of a guardian, this being in the interest of the person affected and for the preservation of his property, it would be logical that the converse would be true in a proceeding to do away with the guardianship. Not only logic, but the statute dictates this. Section 1766, under which this proceeding is brought, provides also what

must be found by the court in order to restore the person to capacity. That is, "that the person is of sound mind, and capable of taking care of himself and his property."

Respondent says in his brief: "The appellant takes the position that it is necessary for the respondent to allege and prove that Katherine des Granges is not only sane but also competent." We agree with appellant in this regard. It is therefore necessary that the sufficiency of the evidence be considered in connection with that portion of the finding holding her capable of caring for herself and her property. The petitioner alleged in his petition that the ward was sane and competent, but offered proof only of sanity. There was no direct or affirmative evidence on the matter of competency. All of the questions asked were on the question of sanity. In fact the record shows the court tried the case on that theory. During the progress of the trial the court said: "The question is whether the woman is sane or insane." "We will adjourn now until two o'clock; get the stuff that pertains to sanity or insanity; if sane she has the right to do what she pleases with her money; the question is whether she is sane or insane; it isn't a question of whether she owes a bill or not."

Upon the conclusion of petitioner's case the appellant moved for a dismissal upon the ground that, irrespective of insanity, there was no proof that the ward was competent. Answering this, the attorney for respondent said, in part: "This court is not going to split hairs to the extent of pleading of this sort when we allege sufficient in our petition and sufficient to have her discharged from the insane asylum; as to how competent she is is another matter; in the evidence it says she is a smart, old woman; there is nothing in the record, your Honor; no evidence offered to show she was incompetent or insane, and we have the record before the court that she is sane, and that court can't hold people in asylums when they are sane; the Wisconsin courts don't—" This proceeding bears no relation to the question of confinement or release from an insane asylum. (*Sullivan* v. *Dunne*, 198 Cal. 183 [244 Pac. 343].) When the case was submitted the court said: "I think the only thing we are concerned with is whether or not the woman is sane or insane; it is conclusively shown that J. P. des Granges was

appointed guardian of the person and property of Katherine des Granges, an insane person, in 1916; he is still acting in such capacity; from the testimony of these depositions it shows that she was paroled from the Institution some time in June—June 23, 1926—and the Superintendent of the Institution said she would not be paroled unless they thought she was sane. On top of that we have an order of court finding she was sane and declaring her to be a sane person. I think that the evidence is conclusive if we recognize the order of the court from that State; it shows that it was done upon notice that she has been declared a sane person.''

There is no evidence to support the finding of the court as to competency, unless, from the testimony of the witnesses on the question of insanity, an inference may reasonably be drawn that she was capable of taking care of herself and her property. The ward was about seventy-six years of age, had been in a state hospital for the insane in Wisconsin for about fourteen years and was not present at the trial. Viewing the evidence as a whole, under the existing circumstances, we think such an inference cannot be reasonably drawn. The rule is that where there is any substantial conflict in the evidence, the conclusion reached by the trial court, after weighing the evidence and considering the inferences that may reasonably be drawn therefrom, will not be disturbed. Not only is it true that the inferences referred to cannot reasonably be drawn from the evidence here, but the record discloses that the court proceeded upon the theory that the question of the ward's ability to handle her property was not in issue. ▮ It is the duty of the court to zealously guard the property of a person who has been declared to be insane or incompetent (*Sullivan* v. *Dunne, supra*), and upon a proceeding to restore such a person to capacity, to require proof not only of said person's sanity, but also of his ability to take care of his property, and that he is not likely to be deceived or imposed upon by artful or designing persons.

For the reasons given the judgment is reversed.

Marks, J., deeming himself disqualified, took no part in the decision of this case.

SLOANE, P. J., Concurring.—I concur in the opinion of Mr. Justice Barnard. Were it not for the fact that the investigation before the court in the proceeding from which this appeal was taken was obviously confined to the question of the mental sanity of the ward, the sufficiency of the evidence to support the judgment of restoration to capacity to manage her own affairs might be upheld.

The trial court found in favor of capacity, and there were general statements of the witnesses for petitioner as to her general competency. But, as pointed out in the opinion here, the testimony was all directed to the question of sanity, and the statements of the trial judge, as shown in the record, so clearly indicate that the findings were governed by the sole question as to whether the petitioner was sane or insane, that it must be conceded that the further conditions affecting her competency to take care of herself or her property, were not taken into account.

Insanity implies want of capacity, but the mere restoration to sanity, such as justifies a discharge from detention in an asylum, does not determine such a restoration as to terminate the necessity for guardianship.

This is indicated by section 2189 of the Political Code, which provides under the subhead "Certificate of Discharge," that such certificate of discharge, *where no guardian has been appointed,* "shall have the same legal force and effect as a judgment of restoration to capacity made under the provisions of section 1766 of the Code of Civil Procedure." (See, as bearing on this point, *Aldrich* v. *Barton,* 153 Cal. 488 [95 Pac. 900].)

Where such guardian has been appointed there is no method of restoration to capacity provided excepting by the procedure under section 1766 of the Code of Civil Procedure, and that section distinctly provides for the calling and examination of witnesses on the hearing, and if it is found that the person is of sound mind, "and capable of taking care of himself and his property, his restoring to capacity must be adjudged, and the guardianship of such person, if such is not a minor, must cease."

In a case like this, where the person under disability is shown to be seventy-six years of age and has been for fourteen years confined for insanity, the question not only

of mental sanity, but that also of capacity to take care of herself and her property, should be made a definite issue, before the protection of a guardian is withdrawn.