[Civ. No. 6845. Third Dist. Jan. 5, 1943.]

Guardianship of the Person and Estate of JAMES E. GORDON, an Incompetent Person. JAMES E. GORDON, an Incompetent Person, Appellant, v. THEODORE J. TREADWAY, as Guardian, etc., Respondent.

Clarence N. Riggins for Appellant.

King & King for Respondent.

ADAMS, P. J.—This is an appeal from an order denying the petition of James E. Gordon for restoration to competency.

Petitioner, on December 23, 1935, after many years of drinking to excess, was committed to the Napa State Hospital, suffering from delirium tremens. At the time of his commitment he owned a rooming house in Napa, which he operated, and where he lived. On January 13, 1936, his son, James E. Gordon, Jr., was appointed guardian of his person and estate. On June 22, 1936, petitioner was discharged from the state hospital upon the ground that he had recovered. He was thereupon permitted by his guardian to return to the rooming house and resume the management and control thereof, and subsequently the son resigned as guardian. Later the Bank of America was appointed guardian, but it also resigned, and about a year prior to the institution of the present proceeding Theodore J. Treadway, coroner and public administrator, was appointed guardian. In April, 1941, said guardian took Gordon to the Napa County Infirmary, where he has since resided. His petition for restoration to competency was filed December 2, 1941.

At the hearing thereon, Dr. Charlesworth, Superintendent of the Napa State Hospital, was called as a witness for petitioner. He testified that he had not seen Gordon since his discharge from the hospital in 1936, until the morning of the hearing, when he had a short talk with him; that in his opinion Gordon was as competent as any man of his age, and that he thought he was "able to handle himself and take care of his affairs." On cross-examination a hypothetical question was asked him, as follows:

"Q. . . . Assume that this man had drunk to excess over many years, had suffered delirium tremens and had been committed to the Napa State Hospital and kept there from

December 23rd, 1935, to June 22nd, 1936, before he was discharged, and assuming that after his discharge he went to his place of residence, which is a rooming house capable of maintaining 40 or 50 roomers and again became addicted to the use of alcoholic beverages until the rooming house became in such a state of undescribable filth until April of 1941, when he was removed to the County Hospital and was there ever since his recovery,—in your opinion do you think that he would be competent to return to his rooming house, which is the property of his estate, where there would be easy access to alcoholic beverages and run the rooming house; further assuming that the rooming house brings in rentals in excess of $500.00 per month?''

His reply was as follows: ''Under such a condition, I would say no, he is not competent but it would not be based upon the fact that he was committed to the Napa State Hospital for delirium tremens and that continued. It would be based on the fact he was a chronic drunkard and was drunk all the time and neglected his business because he was drunk and not because of his mentality.''

He was then asked: ''And does a man of 72 years who has drunk in the manner I have described and you have described, suddenly stop the use of drinking ordinarily where it is easily available to him?'' And his answer was ''no.''

Gordon, testifying in his own behalf, stated that he had quit drinking; that he had not had anything to drink since he had been in the infirmary, though he had had a little money in his possession, and a saloon was only a block away.

Called as a witness for the guardian, petitioner's daughter, testifying as to his condition prior to his commitment to the state hospital, said that at that time he was in a terrible condition; that he had not had a bath for years, and his mental condition was bad, and the house was terrible; that he drank more or less constantly until he was committed to the state hospital; that she used to go up there every few months and clean out the place, and throw out all the bottles; that after his release from the hospital he stayed off of liquor for about a month, then started in on a little beer, and at the end of six months he was drinking; that he kept on getting worse and worse, and that he would take drinks of a half a glass at a time; that he was eating mildewed food and dog food; that she had seen raisins and rice with a coat of mildew on it; that he had not been taking care of him-

self, and that she had gone up there and seen him when he was almost nude; that he was 76 years of age (though he claimed to be but 73); that within a year after his release from the hospital he started in being dirty, and that later they could not even get near him; that his legs were bothering him, and he could not walk upstairs; that he did not bathe himself, and toward the end, did not bother even to go to the bathroom; that the condition of the house was filthy, and one could not endure the smell around his apartment; that he was renting rooms to three or four people, and she tried to clean up the house, but that when it got dirty again, he could not carry on; that the pipe underneath the sink was leaking, and water was all over the floor, and dishes were piled in it; that she did not believe that he was competent to take care of himself and his property, and that she did not think he would refrain from the use of alcohol; that he had scarcely been sober since 1910, except for the time when he first came out of the hospital; that knowing her father as she did, she did not believe he would refrain from drinking to excess.

James E. Gordon, Jr. testified that before his father was committed in December, 1935, he would say that he lived on whiskey except when he got so sick that he would buy a gallon of buttermilk, and that outside of that, he did not think he did anything but drink; that he could not take care of himself and his property; that after his release from the hospital he did not drink for a while, but after about a year he was drinking as heavily as in 1935; that in 1936 his father had asked to be restored to competency, promising that he would not touch liquor again; that thereupon, witness resigned as guardian, and his father was allowed to go back and handle his own money, with the court's permission, though the guardianship was still maintained of record; that before his father was sent to the county infirmary he was drinking all the time; that he saw him about three months before he went to the hospital, and that at that time he sat inside a screen door with just an overcoat over him and without any underclothes on; that he was suffering with his feet because of neglect of them; that in his opinion his father was not competent and capable, unassisted, of taking care of himself and his property; that he would revert to his old habits, and without doubt would go right back to drinking; that under the guardianship of Mr. Treadway his

father's property was in first-class condition for a building of that sort.

Mr. Treadway stated that the property was grossing around $500 a month, but that it had been necessary to expend a considerable amount of the income to put it in condition to rent, and to provide for its care; that when he was appointed guardian, Gordon had just a few rooms rented, and was "kicking" because he could not collect rent; that when he took him to the infirmary the only clothes he had on were a pair of dirty old overalls, torn the full length of the leg, and an overcoat that was torn from the shoulder down, and that the last two or three weeks all he had on was this torn overcoat, and that he said he could not get his shoes on; that he was drunk nearly every day he saw him; and that the day he took him to the infirmary he was shaking so he could hardly talk, and could not stand. In response to the question as to whether in his opinion, provided Gordon stayed sober he thought him competent, he answered, "Knowing Jim like I do I would say no"; that he would not stay sober; that someone would get him and "work him out of everything he has got."

Section 1460 of the Probate Code defines an "incompetent" as any person, whether insane or not, who by reason of old age, disease, weakness of mind, *or other cause,* is unable, unassisted, properly to manage and take care of himself or his property, and by reason thereof is likely to be deceived or imposed upon by artful or designing persons. Under section 1472 of said code, one previously adjudged incompetent must be restored to competency if he is found to be sane and "capable of managing and taking care of himself and his property."

There is no question here of petitioner's sanity; the question before this court is whether or not the evidence before the trial court sustains its order denying Gordon's petition for restoration to competency. In *In re des Granges,* 102 Cal. App. 592, 598 [283 P. 103], the court said:

"The rule is that where there is any substantial conflict in the evidence, the conclusion reached by the trial court, after weighing the evidence and considering the inferences that may reasonably be drawn therefrom, will not be disturbed. . . . It is the duty of the court to zealously guard the property of a person who has been declared to be insane or incompetent (*Sullivan* v. *Dunne, supra* [198 Cal. 183 (244

P. 343)]), and upon a proceeding to restore such a person to capacity, to require proof not only of said person's sanity, but also of his ability to take care of his property, and that he is not likely to be deceived or imposed upon by artful or designing persons." In *Estate of Chapman,* 198 Cal. 145 [243 P. 675], it is said at pages 147-8:

"It would serve no useful purpose to set out in detail the testimony of the petitioner, or the other witnesses. The lower court had the advantage not only of seeing and hearing all of the witnesses, but of observing the appellant herself, and was in far better position than we could be in determining her mental condition. With the witnesses before it testifying to the facts disclosed by the record, the court could very properly conclude that appellant's mental faculties were still impaired to such an extent as to render her incapable of taking care of her property, and that she was still likely to be deceived or imposed upon by artful or designing persons. When it was satisfied that such were the facts, it was its duty to hold that the appellant was still within the definition of an incompetent person found in section 1767 of the Code of Civil Procedure. Its finding on the conflicting evidence will not be disturbed. (*Estate of Schulmeyer,* 171 Cal. 340 [153 P. 233].)"

And in *Mundorff* v. *Ramm,* 66 Cal.App. 553 [226 P. 820], where the competency of one addicted to the excessive use of intoxicants was involved, we find, in the opinion of the court, at page 565:

"Although the illusions, delusions and hallucinations of the deceased, as indicated above, are the characteristics or the result of a mental malady (delirium tremens) which, when taken in time and religiously attended to, is subject to the curative power of appropriate therapeutic treatment, yet, when such occurrences have become common and cover a long period of time, all due to the inordinate prolonged use of intoxicants, they will afford well-nigh unimpeachable, if not conclusive, evidence of substantial impairment of the mentality, or, indeed, of insanity."

And in *Ludwick* v. *Commonwealth,* 18 Pa. 172, note 17 A.L.R. 1088, the court held that to authorize the appointment of a guardian of an habitual drunkard, it is not necessary that he should be always drunk, but the test is whether he has a fixed habit of drunkenness; that "A disposition of mind and body which might lead to the wasting of an estate is

sufficient to justify the appointment of a guardian,'' which is a precautionary measure.

In view of the foregoing authorities and the evidence before the trial court we are unable to say that that court abused its discretion in denying the petition for restoration to capacity.

The order is affirmed.

Schottky, J. pro tem., and Thompson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 1, 1943.