[Civ. No. 17328. Second Dist., Div. Three. May 3, 1950.]

Estate of MABEL E. HUBBARD, an Incompetent Person. HELENA ROUSSEL, Respondent, v. MABEL E. HUBBARD, Appellant.

Guerin, MacKay & Tendler for Appellant.

Brennan & Cornell for Respondent.

WOOD, J.—Helena Roussel filed a petition for appointment of herself as guardian of the person and estate of Mabel E. Hubbard, her mother. She alleged in the petition that Mrs. Hubbard was incompetent and unable to care for herself or her property by reason of the excessive use of alcohol. After a hearing upon the petition, the court found that Mrs. Hubbard was unable, unassisted, to manage and take care of herself or her property, and it made an order appointing petitioner the guardian of her person and appointing a bank the guardian of her estate. Mrs. Hubbard appeals from that order.

Appellant contends that the evidence does not support the implied finding that she is incompetent.

At the time the petition was filed, May 13, 1949, appellant was 60 years of age. Her husband died about 1939, and thereafter she married Jack Williams. She obtained a divorce from Williams in 1947. On May 27, 1949, after appellant had been served with notice of the petition for appointment of guardian, she married Horace Evans. Thereafter the petition was amended to show that appellant was also known as Mabel E. Hubbard Evans.

A physician, called as a witness by the petitioner, testified that he acted as an examiner for the superior court in psychopathic cases; on June 8, 1949 (the day before the hearing herein), he examined appellant who was then a patient in the psychopathic department of said court, and on that day he heard her testify at the hearing in that department; he recommended to the court (at that hearing) that appellant should receive care in a sanitarium for a long time; in his opinion she is a chronic alcoholic; her ability to quit drinking is very remote; and when she is drinking she is not competent or capable of managing her own affairs according to her normal standards.

The manager of a motel, called as a witness by the petitioner, testified that on February 14, 1949, Jack Williams registered at the motel; after he registered, she observed Williams and Larry Crawford "help" appellant into the room; the next

day when she (the manager) went to the room it was in a deplorable mess and liquor bottles were in the room; appellant was in bed, and Williams told her that "his wife" was ill; on February 17th appellant was deplorably intoxicated; on that date the manager notified a physician (at a sanitarium) regarding appellant's condition, and thereafter an ambulance arrived at the motel and appellant was removed from the room on a stretcher; during the time appellant was at the motel Williams never left her alone; on one occasion, when the manager and a maid were cleaning the room, the maid tried to call a telephone number and Williams said, "don't you dare call anybody"; Crawford asked the manager to cash two checks, which were payable to and endorsed by appellant; one of the checks was for $74; the manager refused to cash the checks, and the lessee of the dining room cashed them.

The petitioner (the daughter) testified that she had seen appellant intoxicated many times; on one occasion petitioner's brother (appellant's son), whom appellant had not seen for six years, came from Honolulu to visit appellant; appellant knew he was coming, but when he arrived she was terribly drunk, and petitioner and her brother took appellant to a sanitarium; appellant was in another sanitarium in 1947 for three months and was released in July; that "every once and a while," after she was released from the sanitarium, "she would start drinking again"; about December 1, 1948, when appellant left California to spend the holidays in the East she was a little intoxicated; about January 15, 1949, after she had returned from the East, appellant "disappeared," and the petitioner could not find her for several weeks; the next time petitioner saw appellant was on February 27, 1949, when petitioner "picked her up" at a sanitarium and took her to appellant's home; at that time appellant's wrists were bruised and her face was swollen; appellant told her that "these men had kept her captive in a motel"—that they beat her, forced her to write checks, poured liquids down her throat and mistreated her generally; appellant was angry at that time, and told petitioner that she was going to tell "these people" that she had turned her property over to petitioner, and then they would stop bothering her. Petitioner testified further, in substance, that in March, 1949, petitioner "realized," from telephone conversations with appellant, that appellant was still drinking—and every time she talked with her she was worse; petitioner then went to see appellant, and it was obvious that

appellant had been drinking; petitioner "begged" appellant to stop drinking, and appellant promised to come to petitioner's home the next morning and stay there a few days; during the evening of that same day appellant "disappeared," again and petitioner made numerous unsuccessful efforts to locate her; the next time she talked with appellant was on May 12, 1949, when appellant "called" her and stated that she had been married recently to a man named Horace Evans, and that he was going to take care of her; at that time appellant did not sound like herself—she seemed intoxicated and hysterical, and she "did not make a bit of sense."

Another witness, called by petitioner, testified that he served a "citation" on appellant on May 21, 1949, at the "Lido bar" where she was with Mr. Evans; prior to making the service he had observed them for approximately four hours and during that time they were at the bar drinking; he would say they were very much under the influence of liquor. That testimony was corroborated by another witness, who stated that appellant "was just plain sloppy drunk."

A physician, called as a witness by appellant, testified that he had examined appellant and that she was then under his care; he was unable to detect anything that would indicate mental deterioration, but he found that she had been addicted to the excessive use of alcohol; she had been drinking for a number of years and in the last four or five years had become "more greatly" addicted to alcohol; she now knows she is an alcoholic, and she is sincere in her desire to never drink again; in his opinion she is a competent person to transact her business when she is not under the influence of alcohol.

Appellant testified that she recognized she had certain alcoholic tendencies; she felt she was in need of some guidance, but she thought she had the proper people to guide her; her marriage to Williams was a mistake—she did not stop drinking; during the time she was married to him she invested about $2,500 in a fictitious company in Mexico; in February, 1949, Williams and his friends held her "prisoner" in the auto court in Eagle Rock, and she endorsed checks "over to" Williams; she had known Evans at least three months before she married him. She testified further that her property at the time of the hearing herein consisted of: two trust deeds on which the unpaid balances were $6,900 and $2,700; two notes on which the unpaid balances were $3,500 and $3,675; a bank account in the sum of $300; certain stocks (which appeared to be of a value of approximately $3,000); insurance, with a

cash surrender value, on which the annual premium was $1,250; and a 160-acre farm in Canada.

Section 1460 of the Probate Code provides: "Any superior court . . . may appoint a guardian for the person and estate or person or estate of an insane or an incompetent person. As used in this division of this code, the phrase 'incompetent person,' 'incompetent,' or 'mentally incompetent,' shall be construed to mean or refer to any person, whether insane or not, who by reason of old age, disease, weakness of mind, or other cause, is unable, unassisted, properly to manage and take care of himself or his property, and by reason thereof is likely to be deceived or imposed upon by artful or designing persons." Appellant argues that the evidence produced on behalf of the petitioner was not sufficient to show that appellant was incompetent within the meaning of that section. "Before we can disturb the findings of the lower court upon the ground that they are not supported by the evidence, we must be able to conclude as a matter of law that there is no evidence at all to support the conclusions arrived at by the trial court." (*Guardianship of McConnell,* 26 Cal.App.2d 102, 106 [78 P.2d 1043].) This rule is applicable to a guardianship proceeding. (*Matter of Coburn,* 165 Cal. 202, 212 [131 P. 352].) The court herein could properly have concluded that appellant is a chronic alcoholic. "When an alcoholic shows pronounced mental and physical degeneration, he is termed 'chronic.'" (Stanford L.Rev., vol. 2, p. 516.) In *Guardianship of Gordon,* 56 Cal.App.2d 523 [132 P.2d 824], it was said at page 528: "[I]n *Ludwick* v. *Commonwealth,* 18 Pa. 172 . . . the court held that to authorize the appointment of a guardian of an habitual drunkard, it is not necessary that he should be always drunk, but the test is whether he has a fixed habit of drunkenness; that 'A disposition of mind and body which might lead to the wasting of an estate is sufficient to justify the appointment of a guardian,' which is a precautionary measure." In *Anderson* v. *State of Arizona,* 54 Ariz. 387 [96 P.2d 281], it was held (pp. 393-4) that a person may be declared "to be incompetent to handle his own property because he spends money too profusely or improvidently, or he may so habitually drink to intoxication that it is necessary, for the protection of his property, his family and his own person, that a guardian be appointed either of the person, or of the property, or of both, but . . . the disability is not a lack of mental capacity in either case, in the ordinary sense of the word. It is well known

that there are many men, generally perfectly normal, who at times are not capable of handling their finances in a proper manner during periodic spells of intoxication. . . . A person may, therefore, be declared incompetent to handle his financial affairs for many different reasons, some of which may indicate general mental incapacity, such as extreme old age resulting in senility, or physical disease . . . or the declaration may be based on many other causes which do not imply the ward is of unsound mind . . .." A chronic alcoholic may be declared to be an incompetent person within the meaning of section 1460 of the Probate Code. It cannot be concluded as a matter of law that there is no evidence to support the implied finding of the trial court that appellant is incompetent. In the present case it appears that appellant, while she was intoxicated at the motel, endorsed checks which were payable to her, and that Crawford (the man who was at the motel with appellant and her former husband, Williams) cashed two of those checks at the motel dining room. It also appears that appellant, while she was intoxicated at the motel, suffered personal injuries. As stated in the matter of *In re Cassidy*, 95 Cal.App. 641 [273 P. 69], at page 645, "In cases of this kind it is not necessary to wait until actual loss or damage has been suffered before the beneficent provisions of these statutes may be invoked. It is sufficient when the mental weakness exists, which makes the unfortunate one an easy prey for the designing." In the matter of *In re Jackson*, 34 Cal.2d 136 [208 P.2d 657], it was said at page 143: "Protection of the incompetent from others is the main purpose of the statute [referring to section 1460, Probate Code]."

The order is affirmed.

Vallée, J., concurred.

SHINN, P. J.—I concur: It is too clear for argument that a confirmed inebriate, who is not competent to manage her affairs when under the influence, needs a guardian even though she is competent when she is sober.