## Williams *v.* Williams, Appellant.

Argued September 27, 1955. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ.

*Almanina Barbour Carnes,* for appellant.

*R. Lawrence Clay,* for appellee.

OPINION BY ROSS, J., November 30, 1955:

This is a divorce action brought by the husband on the ground of indignities. The master who heard the case, after lengthy hearings, recommended that a divorce be granted. The court below after a thorough analysis of the record dismissed the wife's exceptions

and granted the divorce, and she has appealed to this Court.

The parties were married in South Carolina in 1926. They moved to Philadelphia in 1927 where they have been ever since. Three children, two girls and a boy, all now adult, were born of this union. Plaintiff has been employed by the Pennsylvania Railroad for upwards of 27 years, working the same daytime shift. Defendant worked from about 1934 to 1944 in a laundry, quitting after an illness. They belong to different churches, both being very active therein. Plaintiff was not only active in his church work, but in several other groups, clubs and lodges as well. Consequently, when he was not required by his employment to spend evenings (and even whole nights on occasion) at work during the winter snows or in the event of a railroad wreck, he spent a good many evenings in his church, club and lodge work.

Apparently the parties had no serious difficulties until 1944. According to the plaintiff when he returned from a church meeting one evening in July of that year, his wife used foul language in disbelief of his whereabouts, accusing him of infidelity. In an effort to reassure her, he promised to hold the meetings at his home, and did so. On this occasion, however, she embarrassed him before the members with foul language and aspersions, directed not only at him but the club members as well. Thereafter, her abuse, nagging and accusations increased. She constantly urged him to move in with "his women", at a church dinner she appeared and heaped abuse upon him and women who were present, she remained silent for long periods, talking only with a "nasty" tongue. In 1948, her campaign of harassment intensified. She refused to cook for him, wakened him at night with singing and arguing, refused sexual relations, hit him in the mouth with

her fist if he touched her, and on one occasion knocked him over a bannister. All during this time, she used vile and abusive language, making constant accusations of adultery. As a result, plaintiff's health suffered, he lost weight and became nervous, for which medical treatment was required. The fact that his health was impaired is strong supporting evidence of indignities. *Clark v. Clark,* 160 Pa. Superior Ct. 562, 52 A. 2d 351. Finally, in the summer of 1953 the plaintiff left the marital habitation. Three witnesses, relatives of plaintiff, corroborated him concerning the abusive language and his failing health.

According to defendant, it was she, not the plaintiff, who was the marital martyr. She testified first by firmly denying each incident charged by her husband and then she accused him of staying out every night and weekends until the early morning hours (although admittedly he had to leave for work at 6:30 a.m. each day and had never missed a day), spending his time with the inevitable "other woman". While she suspected this, and went even to the point of hiring a detective to follow him, she produced not one iota of substantial credible proof in this respect. Several witnesses testified to the general marital bliss they observed on their visits to the family home prior to the separation, as well as the fact that neither of the parties was known to use vile and abusive language. Both the master and the court below correctly concluded that these witnesses had "too formal or casual or infrequent" contacts with the family to give much probative value to this testimony.

The parties' three adult children testified on behalf of their mother. It was their opinion that the plaintiff was neither a good husband or father, "because he was out all the time". They corroborated the defendant in her denial of the use of vile and abusive

language, as well as in her denial of physical abuse of the plaintiff. They portrayed their father as a man who stayed out all night, coming home barely in time to change for work. We agree with the master and the court below that in this instance the picture of this man as painted by these children is not authentic and credible. They contradict not only one another but their mother as well on the dates of the alleged escapades of their father. Were we to believe their testimony on the hours kept by this man, we would have to conclude that he had found the elusive answer to the problem of fatigue. By their testimony, he required no sleep at all, went carousing every night, worked all day, yet their only explanation was "we marvelled how he kept up at the speed he was going at". Outstanding in their testimony are the sweeping generalities concerning the plaintiff's actions, which, under the light of cross-examination, appear truly to be conclusions reached by adding rumor to the harmless circumstance of their father's late hours, whether caused by his work or his lodge and club activities. They admitted that much of their "knowledge" of these "facts" was not of their own observation, but from rumor and hearsay, the prime source of which was the defendant. For example, the son testified that during 1953 the plaintiff was out all night almost every night, yet he admitted that he, the son, lived at home but little over a month that year before his father left. One of the daughters testified that her father was out all night every night, yet she admitted that she went out often and was not home at all times when her father could have been home. Further, she admitted that when her father offered an explanation for his whereabouts she had no reason to disbelieve him. She knew that his work with the railroad often kept him away until late in the night, especially during the winter

snows and when there was a wreck. Whatever the motive behind this clear overzealousness on the part of the children to testify with vigor against their father, we are certain that their testimony is largely that born of unfounded, suspicion, nurtured by time and thought, having no basis in reason or fact, but solely in rumor and emotion.

Aside from her own testimony and that of her children, defendant relied chiefly upon that of James Roundtree, the alleged constant nighttime companion of the faithless husband. According to Roundtree, he and plaintiff visited the "other woman's" home every night, the plaintiff there acting as the head of the house, collecting money for drinks, playing cards and living the gay life. Despite the fact that plaintiff was admittedly not a drinking man, never was drunk and never missed a day's work, this witness claimed that the plaintiff drank profusely. So too, his testimony is contradictory on the time. He first said it was every night in 1944 and 1945, then he testified that it might have been every weekend or every other weekend, and it might have been 1949 or later. Further, although he remembered the details of plaintiff's purported night activities, he could not remember the names of the others involved nor even the address of the house he so frequently visited. This worthless testimony was completely disregarded below and our examination of the record leads us to concur.

A searching analysis of the testimony, witness by witness, persuaded the master and the lower court to conclude that plaintiff and his witnesses were telling the truth rather than defendant and her witnesses. The master's appraisal on this matter of credibility, though not binding upon us, must be accorded the fullest consideration, especially where as here he has painstakingly and in detail reviewed the testimony, making

specific findings on the credibility of each witness, together with his reasons for believing or disbelieving them. *Smith v. Smith,* 157 Pa. Superior Ct. 582, 43 A. 2d 371. Reviewing the testimony of the parties, we agree with the master's appraisal. The plaintiff gave his testimony simply and factually and in detail, appearing nowhere to be self contradictory. The wife on the other hand appears to have been resentful, offering generalities which were contradicted by her specific testimony, testifying more on her aroused suspicions and emotion than upon substantial fact. Credibility may turn upon small conflicts, haughty or evasive answers, contradictions, lack of supporting fact, faulty reasoning, and myriad other factors. This case like most divorce cases turns upon a question of credibility and the record here indicates upon close scrutiny that the master correctly resolved this issue in the favor of the plaintiff.

The plaintiff had the burden of showing by clear and convincing evidence (*Wasson v. Wasson,* 176 Pa. Superior Ct. 534, 108 A. 2d 836), that the wife defendant offered to him, the innocent and injured spouse, such indignities as to render his condition intolerable and his life burdensome (Act of May 2, 1929, P. L. 1237, sec. 10 (f), 23 P.S. 10 (f)), and that her course of conduct demonstrated that her love and affection for him had been replaced permanently by hate and estrangement. *Trimbur v. Trimbur,* 171 Pa. Superior Ct. 541, 546, 91 A. 2d 307, 309. By the credible testimony the plaintiff met his burden and we conclude therefore, from our independent searching of this voluminous record (*McGuigan v. McGuigan,* 178 Pa. Superior Ct. 112 A. 2d 440), that the learned court below properly granted the decree, the substantial competent evidence amply supporting the plaintiff's charge of indignities to his person.

Appellant has raised, in addition to the usual issue of sufficiency of the evidence, the additional assertation that she did not receive a fair and impartial hearing before the master because of certain of his rulings on the evidence. She points to five alleged errors, admitting that none of them alone is prejudicial, but urging that such was their cumulative effect. The only one of these alleged errors of any substance is that the master erred in refusing to admit in evidence a certain picture found among plaintiff's effects by the defendant. Suffice it to say that we have examined the offer and find that there was no proper authentication proffered, consequently it was properly refused and, in any event, the picture was not of sufficient importance to change the result of this action. We have examined all the alleged errors and find no prejudice whatever. Defendant consumed 279 of the 385 pages of this record. She was given wide latitude in bringing in matters even remotely connected with the issue involved. Her hearing was both full and fair, disrupted by nothing which we can find warranting a reversal.

Decree affirmed.