Rose *v.* Rose, Appellant.

438

Argued September 28, 1936.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, James and Rhodes, JJ.

*Peter Kanjorski,* with him *Clement J. Reap,* for appellant.

*Leigh B. Maxwell,* for appellee.

OPINION BY STADTFELD, J., December 21, 1936:

The parties to this divorce proceeding were married April 18, 1923, at Scranton, Pa., where both lived at the time and thereafter continued to live until their final separation on March 27, 1932. The libellant was thirty-six years old at the time of the hearing and is a dentist by profession. The respondent is four or five years older. There is one child, a daughter, as a result of the marriage, eleven years old at the time of the hearing.

Libellant moved his residence to Waymart, Wayne County, on August 18, 1934, but still pursued his profession at Scranton.

Libellant filed his libel in divorce on Nov. 16, 1934, charging respondent with wilful and malicious desertion on March 27, 1932, which had continued for and during the term of two years and upwards, and with offering such indignities to his person as to render his condition intolerable and life burdensome. An answer was filed by respondent, denying the charges in the libel.

A master was appointed who, after hearing the testimony, filed a report in which he found that the respondent did not offer such indignities to the person of the libellant as to render his life burdensome and condition intolerable, and that libellant is not entitled to a decree in divorce. Libellant did not press the charge of wilful and malicious desertion.

Exceptions to the master's report were sustained by the court and a decree in divorce directed to be entered. From that decree, this appeal followed.

The Bill of Particulars, ex parte libellant, alleged in general terms that his wife nagged him continuously for money, and threatened to publicly disgrace him by

having him arrested unless her money demands were met, and eventually did have him arrested; that she held him up to ridicule and humiliation before his friends; that she accused him of immoral conduct with other women, and that she referred to and discussed their sexual relations in public; that she interfered with his business, frequently entering his private operating room while he was operating upon patients and insulting the latter.

In answer to a rule for a more specific Bill of Particulars, the only information filed by the libellant is that "The arrest of the libellant occurred March 9, 1927, and that the respondent openly and publicly accused the libellant with being 'red-headed' and not normal sexually, on June 5, 1931, or June 6, 1931."

It is our duty, while giving due consideration to the report of the master and the opinion of the lower court, "to examine for ourselves the testimony in cases of this character, and to determine therefrom, independent of the findings of an examiner, or even in the court below, whether in truth and in fact a legal cause of divorce has been made out:" *Breene v. Breene,* 76 Pa. Superior Ct. 568, 570. See also *Middleton v. Middleton,* 187 Pa. 612, 41 A. 291; *Nacrelli v. Nacrelli,* 288 Pa. 1, 136 A. 228.

The testimony of the libellant was to the effect that he always gave the respondent all the money that he possibly could; that he gave her from $45 to $50 per week for her own use, and, in addition, paid the rent of the apartment in which they lived, and all bills; that in the face of this she was still dissatisfied and continually nagged for more money; that when he was unable to meet these demands, she would come into his office and create scenes and insult the patients; that she had him arrested on a non-support charge in 1927; that the respondent treated him as a menial in the presence of their friends; that if he dared engage in the general conversation, he was told by her to shut

up, that he was crazy; that she continuously and in the presence of their friends, threatened to leave him, telling him that she knew a major in Detroit who wanted to take care of her anytime she was willing to leave; that she humiliated him by discussing the most intimate details of their sex life in the presence of their friends; that she referred to him during such discussions as red-headed and abnormal sexually.

The testimony of libellant is very general in character. Nearly all of the discussions concerning money matters took place in the early part of their married life, and, in themselves do not constitute indignities as would entitle libellant to a decree.

The charges of being accused of immoral relations with other women are not supported by the testimony. The three specific instances testified to by witnesses on behalf of libellant were in the Elks Club in Wilkes-Barre in 1929, at the Casino in Washington Avenue, Scranton in 1930, and a place called "Bobs Inn" near Lake Wallenpaupack Dam in Wayne County. At the one at the Elks Club in 1929 respondent accused libellant of being too friendly with a Mrs. Smith with whom he had been dancing. There was nothing which would imply immoral relations. The incident at the Casino in Scranton is that respondent accused libellant with trying to make a date with a girl. This did not amount to a charge of immoral relations. The incident at "Bobs Inn" was that respondent accused libellant of attempting to make a date with a waitress, when in fact he was making a professional engagement for some dental work.

Respondent on her behalf, testified that if she called him "red-headed", it was because he was red-headed and it was done jokingly. Respondent denied that she talked of his sexual abnormality publicly, except on one occasion with her husband's friend, Mr. Rittenhouse, a witness for libellant. Mr. Rittenhouse ad-

mitted that he said on that occasion to respondent: "Dr. Rose is rather a hard man to handle sexually."

As to the alleged relations of libellant with Mrs. Clifford, respondent testified that Mrs. Clifford, who is a married woman, went around with Dr. Masucci, who was associated with libellant from August, 1925 to April, 1927. She did not think that she was a fit woman to be around the office and told her husband so, but denied that she ever spoke to the woman or insulted her.

As to the incident at the Casino, respondent testified: "It was all in fun. It was New Year's Eve—different people were drinking highballs; what I said I didn't say seriously. I simply went up to my husband and jokingly said, 'My husband has another lady', like any woman would say, but they have taken it wrong."

Respondent denied the alleged incidents at her home at which were present, Dr. Nealon and Mr. Rittenhouse and their wives, when it is said she slapped her husband and threw his glasses off.

As to the occasion at the Professional Men's Club, she denied having thrown glasses of beer at her husband; she stated that she was playing cards on this occasion and that her husband was doing something else. As to the incident at Bob's cottage, she testified that people were waiting at the car: "Everyone was waiting for my husband and the conversation I heard was that he said he lived in Scranton, was a dentist in the Miller Building and he said (to the girl) he would like to see her sometime and he made an appointment for Saturday afternoon to meet her. I didn't see the girl after that. I didn't make a scene, and there were people in the car and I accused him of making a date with the girl. But he did make the appointment with the girl, I heard that."

As to the party on New Year's Eve at the Elk's Club in 1929, when it was alleged that respondent charged

him with being too friendly with Mrs. Smith, respondent testified: "My husband had a habit of neglecting me completely at dances and dancing with everyone else in the place which was humiliating to me and I resented it."

Ruth Howard, office girl for libellant, testified that the respondent came to the office but never insulted a patient in front of her.

As to the charge that respondent did not make a home for him as a wife should—this is denied by respondent. Respondent is corroborated to some extent by the testimony of Mrs. Laura Kline who worked as a housekeeper for three months in 1931, and by the testimony of Mrs. Harriet James, their housekeeper for eight months in 1930. Mrs. Emma Whitman testified that the parties rented an apartment in her building shortly after they were married and remained there for two years. Libellant also had his dental parlor there at the time. During this period of two years, she never heard of any quarrels between them; that Mrs. Rose was always a worker, a home body and always home at night. She never had any company; that libellant would come in all hours in the morning.

From the testimony, it appears that after their marriage, the parties lived together a couple of years, and then the respondent went on the road engaged in work for some publishing house, and after a separation of two years came back and was reconciled with her husband, at which time she loaned him $1500 in cash, to enable libellant to pay a debt he owed his mother. It also appears that after the reconciliation in 1929, Mrs. Rose again went out on the road in the interest of the publishing firm and was away a great part of the week, returning home Fridays and Saturdays, so that, as the master stated in his report, "there could not be very much 'continued nagging' and indignities during the last three years, for the

reason that the wife was away the greater part of the time and nowhere in the testimony, does it appear that the libellant showed any resentment or objection to her being away in the course of her employment."

The foregoing discussion covers substantially the testimony as to specific occurrences. The balance of the testimony is very general in character. There is no actual proof that libellant suffered in health as a result of the alleged indignities. His own testimony is to the effect, "I became nervous; it affected my health and my disposition changed entirely. I became quiet and morose and lost all interest in life." This statement in itself amounts to nothing.

The controlling question involved is whether under all the facts substantially proved and our law, libellant, as an innocent and injured spouse sustains the charge of indignities to his person, such as to render his condition intolerable and life burdensome as the cause for granting him a final decree of divorce under the Act of May 2, 1929, P. L. 1237.

In *Twaddell, Jr., v. Twaddell*, 95 Pa. Superior Ct. 429, p. 432, this court said that: "The rule of law to be applied is well settled; it is only in cases clearly within the statute that a divorce may be granted; for that reason (when there is no jury trial) the evidence must bear the scrutiny of a master, and then of the Common Pleas, and then of this court, if an appeal be taken. 'In a proceeding dissolving a marriage contract, the case is not to be disposed of on a doubtful balance of the evidence nor upon unsubstantial inferences. There must be a presentation of a clear and satisfactory case on which the determination of the court may be confidently rested, and one who would win a case of this character must be clear of everything which is charged as a cause of separation against the opposite party.' "

What constitutes indignities under our law is set

forth in *Breene v. Breene,* 76 Pa. Superior Ct. 568, 572, as follows: "And it is impossible to lay down a general rule for the determination of what indignities render the condition of the injured party intolerable. It has been held by many courts (see 14 Cyc. 625) that they may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient." See also *Sharp v. Sharp,* 106 Pa. Superior Ct. 33, 161 A. 453; *Esenwein v. Esenwein,* 312 Pa. 77, 167 A. 350; *Mathias v. Mathias,* 114 Pa. Superior Ct. 444, 174 A. 821.

As stated in *Knox v. Knox,* 109 Pa. Superior Ct. 45, 48, 165 A. 769: "But altercations, even if accompanied by slapping or slight blows, incompatability of temper, or manifestation of temporary irritation, are too petty and trifling to justify the granting of a divorce." See also *McCommons, Jr. v. McCommons,* 85 Pa. Superior Ct. 323; *Meinel v. Meinel,* 109 Pa. Su-Superior Ct. 143, 167 A. 379; and *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 181 A. 69.

Examining the entire evidence in the light of the principles set forth in the cases cited, we are driven to the conclusion that the proofs do not come up to the required standard and that the divorce should not be granted.

The decree is reversed, and the record is remitted to the court below, with direction that the libel be dismissed, at the costs of the appellee.