## Othmer, Appellant, *v.* Othmer.

Argued November 20, 1945. Before BALDRIGE, P. J., RHODES, RENO, DITHRICH, ROSS and ARNOLD, JJ. (HIRT, J., absent).

*James S. Berger,* with him *Berger & Sinon,* for appellant.

*R. T. Mutzabaugh,* with him *F. M. Nash* and *Nash & Mutzabaugh,* for appellee.

OPINION BY RHODES, J., January 18, 1946:

This is an action for a divorce a vinculo matrimonii, and the ground alleged was indignities to the person of libellant, Donald F. Othmer. The case was heard before a judge without a jury, and he dismissed the libel. Libellant has appealed.

The parties were married in Rochester, N. Y., on August 17, 1932. Thereafter they lived in Brooklyn, N. Y., until the year 1938, when they established a home in Coudersport, Pa. Libellant is about 39 years of age, and is a chemical engineer. He has engaged in teaching and consulting work. Respondent is about 34 years of age. There was much testimony presented before the court below by libellant and his nine witnesses, and by

respondent and her ten witnesses. The testimony is not free from contradiction and inconsistencies. It does appear, however, that their lives were relatively normal until 1941 with possibly two exceptions. Libellant complains of respondent's conduct in November, 1935, at a dinner in Cincinnati, Ohio, where libellant and respondent were entertained. It was said that respondent at that time became abusive and used profane language. There was a similar occurrence narrated, in February, 1936, when the parties were dining with others in Brooklyn, N. Y. Respondent was said at that time to have become intoxicated, and it was alleged that her remarks were loud and derogatory. Subsequently, in December, 1936, libellant, while away from home, wrote respondent a letter in which he indicated entire satisfaction with his married life and with respondent. In concluding he said: "All of which is very blunt—as befits notes and transcriptions of data on an engineer's calculation pad; but I know you will understand that I am merely saying somewhat more feelingly, somewhat more analytically and somewhat more lovingly than I may have before that you are 100%." In 1937 he assigned to respondent an annual royalty of $5,000 due him from a corporation using one of his patents; and in 1938 they established their home in Coudersport, where they built a house with all modern conveniences; it contained eight rooms and three bathrooms, and a two-car garage was erected adjacent thereto. Libellant's letter and subsequent conduct are conclusive that the two isolated incidents in 1935 and 1936 were not of such a nature as to be entitled to much consideration in the ultimate determination as to whether respondent by a course of conduct which manifested a hatred of and estrangement from the libellant rendered his condition intolerable and life burdensome. See *Putt v. Putt*, 118 Pa. Superior Ct. 74, 78, 180 A. 92. The next incident occurred in October, 1941, when libellant and respondent, in company with an associate engineer of libellant, were dining at a restaurant where

respondent became intoxicated and insulted libellant, throwing food at him and calling him names. This incident may very well be classified as an indignity. The next act constituting an alleged indignity took place in Coudersport in December, 1941. The parties had guests at their Coudersport home for dinner, and respondent became intoxicated to the extent that she had to be taken to her bedroom. It might be pointed out at this time that throughout the testimony it clearly appears that respondent had long been addicted to the use of intoxicants, and that, as one of libellant's witnesses testified, when she was under the influence of liquor she was abusive and quarrelsome, but that when she was normal and sober she was very nice.

A second episode occurred in December, 1941. This was at a party given by friends of libellant and respondent in Coudersport. On this occasion there was much drinking among the guests, as seemed to be the custom among those with whom libellant and respondent associated. Libellant claims that respondent insulted his brother and sister-in-law, and that they immediately returned to New York, although they had intended to stay as guests of libellant and respondent. The situation may have been embarrassing to libellant, but we are unable to construe what occurred as an indignity to libellant. Like a number of others who were present, respondent may have imbibed too freely. An indignity must be "to the person" of the injured spouse. *Hepworth v. Hepworth,* 129 Pa. Superior Ct. 360, 363, 195 A. 924. Uncongeniality with relatives is no such indignity.

The next act is alleged to have occurred nine months later in October, 1942. This arose out of the furnishing of a new apartment in Brooklyn. Considerable money was spent for this purpose, and libellant's principal complaint is that respondent overdrew their joint account. This situation is greatly magnified, and more attention is devoted to it in the testimony than the situation war-

ranted. Assuming that respondent's expenditures in connection with the furnishing of their apartment indicated extravagance, this would be no cause for divorce. *Schulze v. Schulze*, 33 Pa. Superior Ct. 325, 327. The disagreements to which libellant testified, and which related to these furnishings, are rather inconsequential. On the other hand, libellant closed their joint bank account and gave notice to the department stores that respondent was to receive no more credit. This was done notwithstanding the fact that respondent's income was $5,000 a year by virtue of the assignment which libellant had made to her.

Respondent went to their Coudersport home in the middle of October, 1942. Thereafter libellant was absent on business, and this frequently happened, until the middle of November, 1942. Respondent returned to their Brooklyn apartment during his absence. Libellant's testimony indicates that respondent became intoxicated upon his return and refused to allow him to sleep and created a disturbance until four o'clock the next morning. Respondent remained in Brooklyn until December 18, 1942, and was often intoxicated. During this period libellant and respondent had frequent arguments, but libellant's version of the occurrences is not corroborated by a witness who was a guest in their apartment from November 30 to December 18, 1942. Unquestionably, while in a state of intoxication respondent called libellant names which were somewhat derogatory, but it does not appear that libellant was ever seriously affected thereby. She returned to Coudersport on December 18, 1942, libellant arranging the transportation for her and taking her to the train. On January 7, 1943, libellant went to Coudersport as he desired to see what he could do to make it agreeable for her to get a divorce. Previously libellant had stated that if respondent did not get a divorce he would. He urged that she go to Reno. As a result, in Coudersport respondent refused to see libellant except in the presence of her attorney. At that

conference libellant told respondent that he would see to it that she was properly taken care of for a reasonable period if she proceeded to get a divorce.

Respondent returned to their Brooklyn apartment the latter part of February, 1943, with a companion. She remained until the first week in May when she returned to their home at Coudersport. Libellant instituted his action for divorce on the tenth of May, 1943.

From February to May, 1943, the situation was rather tense. It was during this time that respondent made attempts to commit suicide. Her use of alcohol continued unabated and her health degenerated. She lost weight (weighing 85 pounds), and suffered from nervous exhaustion, mitral heart disease and secondary anemia. As matters tended toward a climax during the early part of 1943, respondent drank more than ever, and about May 15, 1943, subsequent to the filing of the libel in divorce by libellant, she again attempted suicide while in an intoxicated condition in their Coudersport home. Libellant was not present. Through the solicitude of friends she was treated at several hospitals.

We are convinced that neither party is without blame, but we are not convinced that their marital difficulties are attributable to respondent to the extent that libellant is entitled to a divorce as the innocent and injured spouse. The law does not define indignities, but to sustain the charge of indignities there must be evidence from which settled hate and estrangement may be deduced, and the law contemplates a course of conduct or continued treatment, not single acts separated by long intervals of time; and it must clearly appear that libellant was the innocent and injured party. *Taylor v. Taylor*, 142 Pa. Superior Ct. 441, 444, 16 A. 2d 651.

After the libellant determined upon his objective, his treatment of respondent seems as cold and calculated as the engineering problems with which he dealt.

Although contradictory of his letter of December 22, 1936, he told respondent that he knew before they were

married that their marriage could not be a success. This he stated not only to respondent but to others in the presence of respondent. This frame of mind naturally had a subtle effect and obvious influence upon their marital relations. Moreover, libellant knew of respondent's propensity to indulge in alcoholic drinks. Throughout their entire married life respondent had used intoxicants. This increased and as a continuance of their marital relationship became uncertain her indulgence became greater. With knowledge of the obvious and inevitable, libellant nevertheless had quantities of intoxicants readily accessible to her. He kept both of his homes well stocked and made no real attempt to prevent her from becoming a confirmed alcoholic. He took her to parties where liquor was served, and her entire environment, for which we think libellant was primarily responsible, was conducive to the use of, rather than the abstinence from, intoxicants. And in this connection we agree with the statement of the court below: "We think he had a responsibility not only to try to shield her from her tendency but to procure proper medical treatment for her." He was aware of her condition but acted as though he had no responsibility. He told others that if they felt that respondent was insane they should do something about it. That attitude is entirely inconsistent with his responsibility as a husband. Another significant statement by libellant was that if respondent did not get a divorce that he would get it, because he was not going to have an insane wife on his neck all his life.

We recognize that excessive or continual drunkenness is not an excuse or justification for a course of improper conduct by one spouse toward the other, but mere drunkenness is not ground for divorce. *Egolf v. Egolf,* 53 Pa. Superior Ct. 254, 256. Respondent's acts were confined to the periods of over-indulgence in drink, and for this situation and condition libellant must bear a large part of the burden. Unquestionably, he was embarrassed at times by the intoxicated condition of respondent and her

attitude toward others, but he made no attempt to change her conduct or cure her propensity. The presence in their homes of large quantities of liquor and the associations which libellant encouraged tended to aggravate her intemperance. His urging that she seek a divorce was a most irritating factor. This attitude on the part of libellant assumes that his conduct was such as to give ground for divorce in an action instituted by respondent. Our conclusions that libellant has not established a case of sufficient merit to warrant the granting of a divorce is the result of a careful consideration of all the evidence in a voluminous record. We recognize that respondent is not free from blame for the condition that exists between her and libellant; but the charge alleged in the libel has not been established to our satisfaction, nor was it established to the satisfaction of the judge who heard and saw the witnesses when they testified. In reference to the consideration to be given by us to the conclusion of the hearing judge, our Supreme Court said, in *Wick v. Wick,* 352 Pa. 25, 27, 28, 42 A. 2d 76, 78, and in *McKrell v. McKrell,* 352 Pa. 173, 179, 42 A. 2d 609, 612: "In determining which of the oral evidence to accept and which to reject, we lack the advantage possessed by the trial judge who, for several days, had the parties and witnesses before him, with ample opportunity to observe them during the trial. The findings of fact made by him have not the same effect on appeal as the verdict of a jury: Esenwein v. Esenwein, 312 Pa. 77, pages 80 and 81, 167 A. 350. Presumably, a trial judge's opportunity to observe the parties and witnesses during the trial, became the basis of a rule that 'when witnesses, who are competent and equally interested, flatly contradict each other, the conclusion of the judge who heard them, as to which is to be believed, is not to be lightly disturbed.' Krug v. Krug, 22 Pa. Superior Ct. 572, 573; Koontz v. Koontz, 97 Pa. Superior Ct. 70; Dearth v. Dearth, 141 Pa. Superior Ct. 344, 15 A. 2d 37. In accord with that rule, we have at times resolved doubt in dealing with conflicting

testimony, by relying on expressed or implied conclusions of the trial judge."

The decree of the court below is affirmed, at the cost of appellant.