Trimbur, Appellant, *v.* Trimbur.

Argued March 18, 1952. Before RHODES, P. J. HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Thomas W. Maher,* for appellant.

No argument was made nor brief submitted for appellee.

Opinion by Reno, J., October 1, 1952:

Wife-appellant sued for divorce, alleging cruelty and indignities. After a hearing, at which defendant did not appear personally or by counsel, the master recommended dismissal of the complaint. Upon her exceptions, the court below recommitted the case to the master with directions "to summon the defendant and examine him respecting his alleged treatment of the plaintiff, and his reasons therefor, and to reconsider the testimony as a whole", and file a supplemental report. The defendant, with counsel, attended the second hearing, and candidly admitted the truth of plaintiff's and her father's testimony taken at the first hearing, while refusing to commit himself as to the further testimony of plaintiff and her witnesses taken at the second hearing. Nevertheless, the master again filed an adverse report, which the court below approved and dismissed the complaint, without an opinion.

The parties were married on February 4, 1950, when both were 20 years of age. They resided with the wife's parents, and she continued to work as a bookkeeper. From the beginning, defendant's conduct was, to state it mildly, unkind and inconsiderate, and became progressively worse, so that his loud and profane verbal abuse culminated in an act of physical violence on September 9, 1950, when they separated.

His lordly attitude toward his wife is aptly illustrated by his indefensible demand that she abstain from attending church services. She was a Baptist; he a Methodist. She had been accustomed, all her life, to attend church and Sunday school regularly. Early in their married life, he refused to permit her to attend church, and as to that testified, "I really hadn't any

reason, I guess", although later he explained: "She didn't like my church and my Reverend, and I didn't like hers. We tried it a couple of times and went to another church, and the mother didn't like that, so that was the end of that." His explanation does not justify his objection to her attending her own church, alone if she so desired. In itself, standing alone, such conduct may not amount to an indignity but it does reveal defendant's unwholesome conception of the privileges of the married state. To place himself between plaintiff and her church and demand compliance with his will as the price of marital peace was an affront to her spirit, and as Judge McPHERSON, one of Pennsylvania's distinguished nisi prius jurists, said in his classic opinion in *Brubaker v. Brubaker,* 4 Dist. R., 185, 187: "The 'person' meant by the [divorce] statute is the indivisible personality formed by the union of body and spirit, and indignities offered to either are necessarily offered to both." See 1 Freedman, Marriage and Divorce, p. 742.

Of a piece was his refusal to allow her to go to the annual church picnic which she had attended since childhood; and his impolite, not to say churlish, reception of their friends who visited them. She was not allowed to see her friends and when they called at the house defendant "practically threw them out." A certain couple called to see them, but defendant refused to go downstairs, and, although they remained only twenty minutes, defendant subsequently told plaintiff her friends had stayed long enough. The same couple again called on defendant's birthday with a gift and after they were in the house a half hour defendant ordered plaintiff upstairs to put up her hair, stating he did not want the company to stay any longer. With other friends of plaintiff, defendant offered to drive them home after a ten minute visit.

Boorish behavior, directed against his wife's friends or his own friends, has not been recognized as a technical indignity. Yet it cannot be doubted that such conduct would be painfully humiliating to a young bride or, for that matter, to "any woman of ordinary sensibility and delicacy of feeling": *Krug v. Krug,* 22 Pa. Superior Ct. 572, 573.

Both parties worked and kept their joint savings in a lock box at home. When questioned regarding the disappearance of their money defendant told his wife to mind her own business. On two or three occasions defendant, in a towering rage of temper, threatened to punch plaintiff in the mouth. In July she was at home on vacation and was sewing in the back yard when defendant returned from work. He was so enraged because she was not in her room to greet him that he broke two lamps, threw the mattress across the room and pulled off the bed spring. He was still so infuriated the following day that he refused to go to work. He swore and cursed at plaintiff and during one tantrum brought his fist back and said to plaintiff, "Jesus Christ, don't let me hit you with this."

The appalling climax was reached September 8, 1950, when defendant refused his wife permission to attend her company's annual picnic, held for employes only. He grabbed her by the throat, choked her, lifted her up off the floor and dropped her. She attempted to run downstairs but he pulled her back, and when she tried to change from a housecoat to street clothes he threw her clothes to the other side of the room. He picked her up by the arms and sat her down hard on the bed several times. After struggling and screaming at the top of the stairs plaintiff broke away, ran out of the house, and down the street to her aunt's where she remained overnight. She testified

she was afraid he was going to kill her. The parties have not cohabited since this altercation.

He frankly admitted: "I lost my head and I struck her", and choked her. Her father suggested that he leave the house, and he left. He returned for his clothing on the following day or, perhaps, several days later, and saw plaintiff briefly. But he made no advances, sought no reconciliation, offered no promise of better conduct in the future or implored forgiveness for what might have been regarded as an impetuous, albeit an unprovoked, physical attack. Instead of exhibiting repentance, when the master asked him: "Q. Would you have made a go of the marriage if you had lived by yourselves?" he replied: "A. That I can't say. We were battling all the time. It may have been worse if we lived alone."

Plaintiff was corroborated by her parents, her aunt, and neighbors. Her mother testified to defendant's constant domineering and obstinate attitude, adding that he was surly at the table and compelled plaintiff to return to their room immediately after dinner every evening. A neighbor testified she heard the parties arguing and defendant use profane language, and on September 8th she saw plaintiff run out of the house and down the street. The aunt stated when plaintiff arrived at her house she was so upset that several hours elapsed before they quieted her. And, as already stated, defendant admitted virtually all his wife's charges and remained silent concerning the testimony of her witnesses.

Our independent study of the testimony has brought us to the conclusion that plaintiff has sustained the burden of establishing her case by clear and satisfactory evidence. There is no material conflict in the evidence, and the master has not indicated any substantial reason for rejecting any part of it. His adverse

reports rested upon the proposition that the one act of violence "was not sufficiently serious either to endanger plaintiff's life or to impair her health" and that defendant's other acts did not "render plaintiff's condition intolerable or her life burdensome."

Undoubtedly, defendant's violence was not so severe as to endanger her life or impair her health; she was not beaten into insensibility or, as the saying is, "within an inch of her life"; but unquestionably it did create a reasonable apprehension of further physical harm, and rendered future cohabitation dangerous to her safety. *Mentser v. Mentser,* 136 Pa. Superior Ct. 582, 7 A. 2d 541. But even if this one act did not amount to statutory cruelty, most certainly it was a gross indignity, and in itself demonstrates settled hatred and estrangement.

An indignity to the person is an affront to the personality of another, a lack of reverence for the personality of one's spouse. It consists of various acts, so varied in their nature and impact that the courts have not undertaken to define the offense in more than general terms. *Crawford v. Crawford,* 64 Pa. Superior Ct. 30; *Breene v. Breene,* 76 Pa. Superior Ct. 568. But the offense is complete when a continued and persistent course of conduct demonstrates that the love and affection upon which the matrimonial status rests has been permanently replaced by hatred and estrangement. For then, when the foundation has collapsed the superstructure falls, and inevitably the married condition becomes intolerable and life is indeed a burden. This is the doctrine of all the cases. *Phipps v. Phipps,* 368 Pa. 291, 81 A. 2d 523; *Hahne v. Hahne,* 168 Pa. Superior Ct. 324, 77 A. 2d 682; *Korona v. Korona,* 166 Pa. Superior Ct. 297, 70 A. 2d 399; *Gross v. Gross,* 165 Pa. Superior Ct. 532, 69 A. 2d 190; *DeDomenico v. DeDomenico,* 161 Pa. Superior Ct. 196, 54 A. 2d 67.

In the nature of the case, no minimum length of time is or can be prescribed for the completion of the offense. The test is not the period of the conduct but its continuity and severity. In *Mason v. Mason,* 131 Pa. 161, 18 A. 1021, the parties lived together for six months; in the *Brubaker* case, supra, for four weeks; and in *Elmes v. Elmes,* 9 Pa. 166, *one week.* Where, as here, habitual verbal aspersion and imperious demands are accompanied by threats of physical violence, and actually followed by an assault and battery, a case of indignities is abundantly proven. Appellant is entitled to a divorce on the ground of indignities to the person.

The decree dismissing the complaint is reversed, the complaint reinstated and the record remitted to the court below with directions to enter a decree of absolute divorce on the ground of indignities.