Robinson *v.* Robinson, Appellant.

Argued November 13, 1956. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ.

*V. J. Rich,* with him *Margiotti & Casey,* for appellant.

*Richard F. Jones,* with him *Wendell G. Freeland,* and *Jones, Smith & Freeland,* for appellee.

OPINION BY ERVIN, J., June 11, 1957:

This is an appeal from a decree granting a divorce a.v.m. to the plaintiff on the ground of indignities to the person. The parties were married on June 29, 1954 and the divorce action was filed on December 27, 1954. The grounds alleged were indignities to the person and cruel and barbarous treatment. Four hearings were held before the master, who recommended a decree of divorce on both grounds. Exceptions were filed by the defendant, but the court below entered a decree of divorce on the ground of indignities to the person.

The master had the advantage of seeing and hearing the parties and their witnesses and observing their appearance and demeanor while testifying whereas we are confined to the printed record. The demeanor of witnesses is the very touchstone of credibility and may well be the deciding factor in appraising trustworthiness. *Megoulas v. Megoulas,* 166 Pa. Superior Ct. 510, 512, 72 A. 2d 598.

The master concluded that the weight of the credible testimony rested with the plaintiff. While we are not bound by his findings, his conclusion upon the credibility of witnesses must be given the fullest consideration and should not be lightly disregarded. *Brown v. Brown,* 163 Pa. Superior Ct. 490, 63 A. 2d 130. After a careful and independent review of the record, we conclude that the decree should be affirmed.

On June 29, 1954, the date of the marriage, plaintiff was 73 and the defendant was 45. Defendant's two prior marriages ended in divorce. Plaintiff's first wife died on December 6, 1953. The parties became engaged on January 1, 1954. After their marriage on June 29, 1954 the parties took up residence at the home of the plaintiff in Allison Park, Allegheny County, Pennsylvania. In July or August of 1954 the defendant picked up a big skillet and struck a kitchen table and sink, damaging both. In addition, defendant broke a number of dishes. The defendant then left the plaintiff but returned in four or five days. Approximately three weeks later the defendant broke an old-fashioned clock which the plaintiff was fond of, together with a second clock and more dishes. After the incident the defendant left the plaintiff for four or five days before she returned. Three or four weeks later, the defendant again broke dishes and left the plaintiff. She returned four or five days later. When a 45-year-old defendant breaks the personal property of a 73-year-old plaintiff and leaves him three times, within four months of the date of the marriage, to take care of himself and his home, it is evidence from which an inference of settled hate and estrangement may be found.

On October 4, 1954, while the plaintiff was in bed, the defendant threw a butcher knife at him. The knife weighed about one pound and had a nine-inch blade. Fortunately for the plaintiff, she missed. However, not being satisfied with her poor marksmanship, she tried again and threw a crockery slop jar at him. Again she missed the mark. While the plaintiff was leaving the house to summon the police, the defendant threw another object at him.

On October 6 or 7, 1954 the defendant returned to the plaintiff's home, with her daughter, to get some of her clothes. The defendant, unknown to the plaintiff,

took from its hiding place a strong box containing over $30,000.00 and other valuable papers which belonged to plaintiff, and left. When the plaintiff discovered that the strong box was gone, he questioned the defendant. She did not return it and legal proceedings were instituted to effect its recovery..

On October 11 or 12, 1954, the defendant again returned to the plaintiff. One night, while the plaintiff was sleeping in a downstairs bedroom, the defendant fired a revolver out of a kitchen window. The plaintiff managed to take the gun away from her, but a struggle ensued during which the defendant attempted to strike the plaintiff with a broom. The plaintiff took the broom away from her but she grabbed him in the groin. Finally, the defendant, who weighed approximately 225 pounds, fell to the floor. The defendant again left the plaintiff but she returned in December of 1954.

Two days before Christmas, 1954, while at the dinner table, the defendant threw a fork at the plaintiff. It was 11 5/8 inches long and weighed about one pound. The defendant forced the plaintiff to the floor, tried to bite the plaintiff, then spit at him a dozen times. She then yelled "Murder, murder, murder." The plaintiff called for the defendant's daughter. While plaintiff was helping the defendant out of the house, she attempted to throw her weight against him but fell into a rhododendron bush. The plaintiff ran back into the house, whereupon the defendant broke the front door glass. Shortly thereafter the plaintiff filed this divorce action. None of the incidents above described were provoked by any actions of the plaintiff. The only explanation which the plaintiff could give was that the defendant had been drinking. The defendant made a general denial.

An indignity to the person is an affront to the personality of another, a lack of reverence for the personality of one's spouse. It consists of various acts, so varied in their nature that the courts have not undertaken to define the offense in more than general terms. But the offense is complete when a continued and persistent course of conduct demonstrates that the love and affection upon which the matrimonial status rests has been permanently replaced by hatred and estrangement. For then, when the foundation has collapsed, the superstructure falls and inevitably the marriage condition becomes intolerable and life is indeed a burden. *Trimbur v. Trimbur,* 171 Pa. Superior Ct. 541, 546, 91 A. 2d 307.

The assaults and batteries committed by the defendant, coupled with the other acts, constitute indignities to the person. Cruel and barbarous treatment and indignities to the person are separate and distinct grounds for divorce. *Eberly v. Eberly,* 154 Pa. Superior Ct. 641, 644, 36 A. 2d 729, but treatment in the nature of cruelty may be considered on the issue of indignities. *Sharpe v. Sharpe,* 177 Pa. Superior Ct. 76, 80, 110 A. 2d 804; *Trimbur v. Trimbur,* supra.

The defendant objected to the testimony of Dr. Kelly and Dr. Frederick on the ground of privilege. The court below did not consider the testimony of Dr. Frederick. We likewise will honor the defendant's request and will not consider the testimony of either doctor. The hospital record, which the defendant objected to, was withdrawn from the evidence by the plaintiff and we did not consider it.

Plaintiff was corroborated in some of the details by the police officers. Defendant's witnesses testified in a general, negative vein, and did not seriously contradict what is clear from the record concerning the behavior of defendant. The plaintiff testified that he

"was scared" and that "I am a nervous wreck. Some nights I can't sleep." The plaintiff was 28 years older than the defendant. The defendant was a large woman, weighing approximately 225 pounds. It is abundantly clear from the record that the defendant's unprovoked conduct did have considerable effect upon the plaintiff. A younger man might well have been "scared" by the violent and strange conduct of the defendant and certainly an older man would be affected to a greater extent. Furthermore, the plaintiff most certainly was obliged to look after himself without the aid and assistance of a wife during the many periods when the defendant abandoned the plaintiff. This appears to us as another case where a younger woman marries an older man, not because of any love or affection but merely to obtain his money and property. There is nothing particularly wrong with this endeavor provided the woman makes some contribution to the welfare and happiness of her husband.

We are convinced that the plaintiff is the innocent and injured spouse and has proved his case by a preponderance of clear and satisfactory evidence.

Decree affirmed.

———

Dissenting Opinion by Rhodes, P. J.:

I am unable to agree with the majority opinion that plaintiff, John H. Robinson, is entitled to a divorce on the present record. The majority suggests that this is a case where a younger woman married an older man for his money and property alone without giving anything in return therefor. Even if true, it would not afford a legal basis for severing the marital tie. As I view it, the matter is in fact much more complex. Therefore I file this dissent.

The master and the lower court considered credibility the determinative issue, as in most respects the

testimony presented by the parties and their witnesses was contradictory or placed a different interpretation upon certain incidents. If there was nothing else in the case the master's conclusions on credibility would be entitled to the fullest consideration unless the record reveals error in this respect. *Silfies v. Silfies,* 168 Pa. Superior Ct. 421, 423, 79 A. 2d 130. An independent review indicates that in general the credibility has been properly resolved; but I find also that, accepting the evidence presented by plaintiff largely in its entirety, there is not present the clear proof of imperious reasons necessary for dissolution of the marriage. *DeFrancesco v. DeFrancesco,* 179 Pa. Superior Ct. 106, 108, 115 A. 2d 411. The conduct of defendant, of which complaint is made, was in many respects not directed to the person of plaintiff; and that which was so directed does not amount to a course of conduct indicative of a settled hate and estrangement.

At the time of their marriage plaintiff was seventy-three years of age and defendant was forty-five years of age. They had been friends for more than twenty years. Defendant's two prior marriages ended in divorce. Plaintiff's first wife died on December 6, 1953. The parties became engaged on January 1, 1954. After their marriage on June 29, 1954, they resided at plaintiff's residence in Allison Park, Allegheny County. They were separated finally on December 23, 1954, after several previous short separations. They live in their respective homes in Pittsburgh.

Plaintiff related six incidents of alleged misconduct by defendant upon which he bases his complaint. The pattern of defendant's conduct on all occasions seems to have been the same, being spontaneous and unprovoked rage. The first three incidents took place in the first three months of the marriage. Plaintiff testified that in the latter part of July or the first part of

August, 1954, defendant, without provocation and for no apparent reason, slammed a large skillet on the kitchen table, and that she threw dishes on the floor. He said defendant then left the house with her mother and brother but returned within four or five days. Three or four weeks later defendant again broke dishes and smashed two clocks. Then she left in a taxi, returning to the marital home after a few days. Three weeks thereafter the same thing occurred. The only explanation which plaintiff could give for these unprovoked incidents was that defendant had been drinking. Defendant made a general denial. Assuming that the incidents happened as related by plaintiff, they do not support a decree of divorce. Under section 10 (f) of The Divorce Law, Act of May 2, 1929, P. L. 1237, 23 PS §10 (f), the indignities sufficient to establish a cause for divorce must be those directed to the person of the injured and innocent spouse. *Hepworth v. Hepworth,* 129 Pa. Superior Ct. 360, 363, 195 A. 924; *Trimbur v. Trimbur,* 171 Pa. Superior Ct. 541, 543, 91 A. 2d 307. Plaintiff may have been innocent on these occasions as defendant acted without apparent reason or provocation, but he was in no way injured as the conduct admittedly was not directed to his person; he was not the object of defendant's temperamental behavior. Therefore I do not agree with the majority that these incidents furnish evidence from which an inference of settled hate and estrangement may be found.

The three subsequent incidents, one occurring each month during the last three months of cohabitation, were of the same type except that on these occasions defendant directed some physical abuse toward plaintiff. The first of these, which plaintiff terms the "main one," occurred on October 4, 1954. On this evening plaintiff had retired to an upstairs bedroom when suddenly de-

fendant came up the stairs, broke a window, and threw a kitchen knife at plaintiff as he lay in bed. She also threw a cuspidor. Neither object, however, struck plaintiff. He was able to calm defendant to some extent, whereupon he drove to a police station to summon assistance. He returned with the chief of police and an officer. Although defendant at first would not admit them to the house, she opened the door on learning their identity. The police officers testified that she was in a hysterical condition, that she was loud and boisterous, and that there was a strong odor of alcohol. Defendant was persuaded to go to a hospital, but she refused to ride in an ambulance. She rode in the police car and was "hollering and very talkative all the way . . ." When they arrived at the hospital the police had to take her into the building forceably; a sedative was administered. She was admitted to the psychiatric division and remained there from the fourth of October until the sixth of October, when she left against the orders of the psychiatrist in charge. One of the doctors who examined defendant, Dr. W. J. Kelly, testified that she was resistive, agitated, and upset, that she used abusive language, and that she admitted a "recent bout of alcoholism." The psychiatrist, Dr. J. N. Frederick, diagnosed her condition as "Chronic alcoholism." Upon leaving the hospital defendant returned with her daughter to the marital home to gather some clothes before going to her house on Adelaide Street. The following day plaintiff discovered that a strong box, which contained documents and approximately $32,000 in cash, was missing; whereupon he went to defendant's house to discuss the matter with her. She kept the box for approximately one month, after which, on November 5th, she placed it in a safe deposit box in her own name. It was placed subsequently in both names. The box and its contents are the subject of a

replevin suit between the parties. Upon defendant's return the parties continued to live together until the next incident on November 23d. Plaintiff was asleep downstairs when he was suddenly awakened by three shots fired by defendant from a revolver. Defendant made no attempt to shoot plaintiff. Cf. *Wiggins v. Wiggins*, 171 Pa. Superior Ct. 298, 302, 90 A. 2d 275. Plaintiff successfully obtained the gun from defendant, and removed the remaining cartridges. They engaged in a tussle as a result of which defendant injured her shoulder. On this occasion defendant called the police; an officer came but no formal action was taken. Defendant again left the marital home and went to her house on Adelaide Street for a few days. Plaintiff went on a hunting trip, and shortly after his return in the first part of December the parties resumed cohabitation.

The last incident before the final separation occurred on December 23, 1954. Defendant, without warning or provocation, threw a fork at plaintiff who was not injured. Plaintiff was able to calm her, and defendant's daughter was summoned. After gathering some personal belongings defendant left, assisted by her daughter and plaintiff. Defendant did not return thereafter to the marital home as four days later, on December 27, 1954, plaintiff caused this divorce action to be instituted.

Plaintiff was corroborated by the police officers and the doctors in those matters which I have indicated; in other respects he depends upon his own testimony. Defendant either denied the incidents or glossed over their seriousness. She testified that the only marital discord came as the result of differences concerning marital relations, and the failure of plaintiff to repair the house and buy new furniture. Defendant's other witnesses testified in a general and negative vein, and did not

seriously contradict what is clear from the record concerning the behavior of defendant and its cause and legal effect.

It is obvious that, except for the use of abusive language in the hospital, the extent of defendant's conduct consisted of displays of temper and certain limited physical abuse directed toward plaintiff. This conduct may be more in the nature of cruel and barbarous treatment than of indignities. Although both grounds were alleged and the master believed that both were present, it is my opinion that the lower court correctly concluded that cruel and barbarous treatment had not been established.[1] Cruel and barbarous treatment and indignities to the person are separate and distinct grounds for divorce (*Eberly v. Eberly*, 154 Pa. Superior Ct. 641, 644, 36 A. 2d 729), but treatment in the nature of cruelty may be considered on the issue of indignities. *Sharpe v. Sharpe*, 177 Pa. Superior Ct. 76, 80, 110 A. 2d 804; *Trimbur v. Trimbur*, supra, 171 Pa. Superior Ct. 541, 546, 91 A. 2d 307. In order to establish indignities, it is ordinarily necessary to produce evidence of a course of conduct indicative of a settled hate and estrangement. *DeFrancesco v. DeFrancesco*, supra, 179 Pa. Superior Ct. 106, 111, 115 A. 2d 411. No minimum period may be fixed below which conduct cannot be said to amount to a "course of conduct"; the basic test is the continuity and severity of the conduct. *Trimbur*

---

[1] The conduct of defendant in throwing objects, such as the knife, and her hysteria may indicate something more than a slight display of temper or temporary irritation (*Knox v. Knox*, 109 Pa. Superior Ct. 45, 48, 165 A. 769), but the three incidents recited do not establish statutory cruelty. See *Sleight v. Sleight*, 119 Pa. Superior Ct. 300, 303, 306, 307, 181 A. 69; *Edelman v. Edelman*, 165 Pa. Superior Ct. 485, 487, 69 A. 2d 165; *Megoulas v. Megoulas*, 166 Pa. Superior Ct. 510, 512, 513, 72 A. 2d 598. No single incident was sufficiently severe in itself to meet that requirement. See *Eberly v. Eberly*, 154 Pa. Superior Ct. 641, 645, 36 A. 2d 729.

*v. Trimbur,* supra, 171 Pa. Superior Ct. 541, 547, 91 A. 2d 307. Both are lacking here. With respect to continuity, it appears that, except for these last three incidents, the parties had no serious discord; plaintiff testified that otherwise they got along "all right." They were isolated incidents at most. See *Deutsch v. Deutsch,* 141 Pa. Superior Ct. 339, 343, 14 A. 2d 586. The severity is minimized when consideration is given to the effect which defendant's conduct had upon plaintiff. He testified that he was "scared," and that "I am a nervous wreck. Some nights I can't sleep." As I view it, this testimony carries no weight. *Rose v. Rose,* 124 Pa. Superior Ct. 437, 444, 188 A. 595. The parties were reconciled after each of the incidents except the last; and, although this is not controlling, it may be considered in evaluating the severity of the conduct and its effect upon plaintiff. *Moyer v. Moyer,* 181 Pa. Superior Ct. 400, 412, 124 A. 2d 632. In fact, two days after the incident of November 23d, plaintiff had Thanksgiving dinner with defendant and her family.

It clearly appears that defendant was not well, and that her condition was responsible in large measure for her conduct. See *Barnes v. Barnes,* 181 Pa. Superior Ct. 427, 434, 435, 124 A. 2d 646; *Moyer v. Moyer,* supra, 181 Pa. Superior Ct. 400, 412, 413, 124 A. 2d 632. Plaintiff testified that nothing preceded the incidents which apparently came "out of the blue." As he expressed it she acted as though her mind just snapped. The final incident was preceded by a discussion concerning a Christmas tree, but it was not sufficient to bring the reaction which followed. See *Barnes v. Barnes,* supra, 181 Pa. Superior Ct. 427, 435, 124 A. 2d 646. The chief of police testified that plaintiff told him on the first occasion that defendant was mentally ill and needed hospitalization; and apparently plaintiff attempted to have her committed to a mental institution. Both

police officers testified to defendant's hysteria and frenzy; one officer said that "She was not in her natural state of mind." Dr. Kelly observed that defendant was resistive, agitated, and upset when admitted to the psychiatric division of the hospital, where she was kept under restraint. The psychiatrist, Dr. Frederick, testified that he examined the defendant and found that "The history indicates mental discord and alcoholism. . . . Diagnosis: Chronic alcoholism."

Drunkenness in itself is not a ground for divorce, and it will not excuse or justify a course of improper conduct by one spouse toward the other. *Steinman v. Steinman,* 144 Pa. Superior Ct. 193, 195, 197, 18 A. 2d 816; *Othmer v. Othmer,* 158 Pa. Superior Ct. 384, 390, 45 A. 2d 389; *Slavin v. Slavin,* 162 Pa. Superior Ct. 636, 638, 60 A. 2d 355. Defendant's conduct, however, was not merely drunkenness or its result. She was suffering from a mental condition which was diagnosed as "Chronic alcoholism," which is a distinct psychotic disease. See *Soltaniuk v. Metropolitan Life Insurance Company,* 133 Pa. Superior Ct. 139, 142, 2 A. 2d 501; *New England Mutual Life Insurance Co. of Boston v. Hurst,* 174 Md. 596, 199 A. 822, 825, 831; *Benjeski v. Benjeski,* 150 Pa. Superior Ct. 57, 60, 27 A. 2d 266. " 'When an alcoholic shows pronounced mental and physical degeneration, he is termed "chronic." ' " [2] *In re Guardianship of Hubbard,* 97 Cal. App. 2d 321, 217

---

[2] "Chronic alcoholism" is the pathological result of the habitual use of alcohol in toxic amounts. Stedman's Medical Dictionary, 17th Ed.; The Merck Manual of Diagnosis and Therapy, 8th Ed., p. 1091. It is to be distinguished from "alcoholism" which is the mere morbid effect of excessive ingestion of ethyl alcohol, from "acute alcoholism" which is a temporary mental disturbance with muscular incoordination, and from "dipsomania," or spree drinking, which is a periodic urge to drink with the desire usually absent between episodes. The Merck Manual of Diagnosis and Therapy, 8th Ed., p. 1091.

P. 2d 744, 747. Persons suffering from this condition are generally impulsive, untruthful, and unreliable, and there is a tendency to gloss over unpleasant behavior. The Merck Manual of Diagnosis and Therapy, 8th Ed., p. 1094. The latter is obvious in defendant's testimony; her attempts to minimize her impulsive conduct and drinking on the three occasions are clear. Undoubtedly defendant's conduct was the result of this mental condition; it certainly is not indicative of an intentional settled hate and estrangement.

I note another aspect of this case. Plaintiff testified that he intended to seek a divorce after the incident when he learned that the strong box was missing. His conduct thereafter seems to have been directed toward the recovery of the strong box rather than the preservation of their marriage. He told defendant he would hold up the divorce proceeding if she would release the money and return it to him. It had been placed in both names. Plaintiff testified that the event which made him decide to proceed with the divorce action was when he believed defendant went to the bank for the purpose of obtaining the joint fund. He then instructed his attorney to file a complaint in divorce. Plaintiff's own conduct, in this respect, raises some question of his good faith in the matter, and it certainly detracts from his claim that defendant's temperamental conduct rendered his condition intolerable and his life burdensome. See *Garroway v. Garroway*, 163 Pa. Superior Ct. 317, 319, 61 A. 2d 379, affirmed 361 Pa. 464, 65 A. 2d 414.

It is my conclusion that plaintiff has not met his burden. In fact, his own case establishes the explanation for the conduct of defendant. He has shown only isolated conduct which sprang from defendant's illness or was intensified by it. The majority would ignore this phase of the case because the defendant for some

588

reason objected to the medical testimony. The more important fact is that this evidence was introduced as part of the plaintiff's case, and it clearly demonstrates that the cause for defendant's conduct was beyond her voluntary control. Moreover, the plaintiff has cast doubt upon his own good faith. He had known defendant for at least twenty years, and they were engaged for more than six months prior to the marriage. Defendant's condition did not come about suddenly; it developed slowly and over a period of time as its chronic nature implies. Plaintiff undoubtedly knew something of the situation he was encountering; the evidence so indicates. It is regrettable when parties to a marriage are not compatible; but when discord arises from a wife's ill health, it affords no ground for a divorce. *Moyer v. Moyer*, supra, 181 Pa. Superior Ct. 400, 413, 124 A. 2d 632.

The decree of divorce should be reversed and the complaint dismissed.

Judge WRIGHT joins in this dissent.