Trueg, Appellant, *v.* Trueg.

Argued April 15, 1959. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Louis Vaira*, with him *Daniel B. Dixon*, for appellant.

*Carl Brandt*, with him *Brandt, Riester, Brandt & Malone*, for appellee.

OPINION BY GUNTHER, J., June 10, 1959:

This appeal is from the refusal of the court below to enter a decree in divorce on the ground of indignities. On November 14, 1955, Albert Trueg filed a complaint in divorce a.v.m. against his wife, Gloria Margaret Trueg, charging her with indignities to his person. Although the wife was properly served, no answer was filed to the complaint. However, a petition for alimony, *pendente lite* was filed and, in accordance with a stipulation signed by the parties and their

counsel, the court ordered payments to be made by the husband. The case was called for trial on June 19, 1958, at which time counsel for the wife appeared in court and stated that he was instructed by the wife to withdraw his appearance and not to contest the action. Thereupon the case proceeded as an uncontested action, and testimony was taken and concluded the same day. On October 28, 1958, the court below entered an order refusing the decree in divorce on the ground that the testimony was incomplete, "without prejudice to either party to re-list for trial."

The parties were married on April 15, 1926. Two girls were born of this marriage, both of whom were married and living away from the parents. The husband is 52 years of age and the wife is 52 years of age. The husband was employed by Mesta Machine Company as a machinist until 1940, at which time he purchased a business from his uncle, called the Pittsburgh Instrument and Machine Company. Thereafter, he continued in business for himself.

The husband testified that difficulties arose early in their married life. The wife continually abused him verbally by foul language and calling him vile names. The wife's conduct continued not only during the time they were alone but also in the presence of friends and mutual acquaintances. He testified that during the time he was employed at Mesta Machine Company, upon his return from work, she began her violent verbal barrages. His work was of such nature that he retired at eleven o'clock in the evening so as to properly perform his work the next day, which began at seven o'clock in the morning. She made it impossible for him to get his proper rest by continuing her verbal attacks upon him. He closed his bedroom door but she came in and continued calling him vile names and insisted that he had to listen to her. Sometimes this

would continue until four o'clock in the morning with periodic visits to his room every half-hour to forty-five minutes. Whenever the violent arguments ceased, she gave him the silent treatment and for days and weeks at a time she completely ignored him and wouldn't speak to him. When friends came in, she started arguments and called him vile names in their presence, and when their friends asked her to refrain from such treatment, she replied that he had it coming to him. He stated that, according to his wife, he just couldn't do anything right and that he was always wrong.

The parties had a lot of arguments over financial disagreements. In order to better his economic station in life, he purchased a business for himself. The business prospered and he had a large income to improve his financial conditions at home. He purchased a comfortable home costing $35,000.00. He hired domestic help and the wife, instead of being satisfied, became critical of him. Upon paying the domestic help at the end of the week, she would say: "Now you pay a stranger; how about paying me a salary for being a housewife?" She had charge accounts in every department store in the city and he paid the bills. He bought her a used car so that she could learn to drive. After she learned to drive, he bought her a new car. The disagreements, however, continued. This course of conduct was such that the husband filed a suit in divorce in 1948, but shortly thereafter he discontinued the action because he wanted to have his two daughters complete their education. Thereafter, one daughter graduated from the University of Pittsburgh and the younger daughter graduated from high school and business school. He provided funds for her recreation. On one occasion she went down to Florida to visit her sister. The husband gave her $500.00 for this purpose. While in Florida, she called his office and talked to

the bookkeeper and secretary and said: "You tell that cheap son of a bitch husband of mine what you think of him. Tell him he is cheap. You might as well know it, too. He only gave me $100 to come down here for several weeks." This injection of the marital difficulties into his business life caused him much embarrassment and he showed his check book to the bookkeeper, indicating that he gave his wife $500.00 for the trip.

He further testified that this course of conduct so affected his health that he couldn't work any more, that he was forced to take sleeping tablets to get some sleep.

This testimony of the husband was corroborated by three witnesses. Olga Muraska, the secretary-bookkeeper, corroborated the testimony regarding the telephone conversation she had with the wife. Richard Theobold, one of the sons-in-law, testified that shortly after he was married, he lived with plaintiff and his wife. He testified that he was present when these scenes took place and stated that his mother-in-law had a violent temper. After he left their home, he visited the family on weekends and from these personal observations he stated that the wife showed a disdain and lack of affection for the husband. William Delmar, the other son-in-law, testified that he visited the Trueg residence over the weekends and was present when some of these scenes took place; that he heard the wife accuse the husband of being neglectful in financial matters; and that he considered her continual criticism of the husband as unfair. Upon being interrogated by the court, he testified that the wife was generally spiteful and hateful toward her husband and showed very little love or affection for him.

Since this was an uncontested case, the sole question raised on this appeal is whether the evidence, pro-

duced by the plaintiff and his witnesses, established indignities within the meaning of the divorce law.

The term "indignity" is not possible of any specific or exact definition and each case must depend on its own facts. However, the principles applicable to the charge of "indignities to the person" have been considered often by us and have been set forth in a number of cases. See *Giuffre v. Giuffre*, 187 Pa. Superior Ct. 154, 144 A. 2d 477; *Rosenblatt v. Rosenblatt*, 186 Pa. Superior Ct. 503, 142 A. 2d 390; *Boyer v. Boyer*, 183 Pa. Superior Ct. 260, 130 A. 2d 265; *Robinson v. Robinson*, 183 Pa. Superior Ct. 574, 133 A. 2d 259. These and other cases too numerable to mention have stated that the offense is complete when a continued and persistent course of conduct demonstrates that the love and affection upon which the matrimonial status rests have been permanently replaced by hatred and estrangement. As reiterated by Judge WRIGHT in the case of *Giuffre v. Giuffre*, supra, "an indignity is an affront to the personality of another, a lack of reverence for the personality of one's spouse." Indignity, as used in the statute authorizing divorce, may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement. These specific acts, however, must be considered in connection with the background of the parties, their position in life, the motivating force giving rise to them, the character and disposition of the parties. *Rosenblatt v. Rosenblatt*, supra; *Hewitt v. Hewitt*, 136 Pa. Superior Ct. 266, 7 A. 2d 45.

Neither the court below nor this Court can escape the burden of a careful consideration of the evidence to ascertain if it establishes the statutory ground for divorce. *Foley v. Foley*, 188 Pa. Superior Ct. 292, 146

A. 2d 328. We have been unable to find from this record that the court below has met this duty. We find only that the decree for divorce was refused on the ground that the testimony was incomplete. The test in granting or refusing a divorce, however, is not based on whether the testimony is complete or incomplete, but, rather, on whether the evidence presented made out the cause for divorce. In lieu of an opinion, the court below filed an order just prior to the argument of this case in which it stated, inter alia, that the previous order entered is patently erroneous for the reason that the said order indicated the case was to be relisted for trial to enable the wife to offer pertinent testimony. In view of the statement of counsel for the wife, incorporated into the record, to the effect that she does not wish to contest this action and that she has instructed him to withdraw his appearance, we are at a loss to understand this order. The testimony having been concluded, we believe the proper procedure should have been an adjudication of the matter based upon the evidence presented. Our review of the record reveals that the evidence produced by the plaintiff and his witnesses, being unimpeached and uncontradicted, made out a case of indignities to the person of the plaintiff as to render his condition intolerable and life burdensome. The vulgarity, unmerited reproach, intentional incivility and manifest disdain disclosed by this case was sufficient to grant the divorce.

The order of the court below is reversed and the record is remanded for the purpose of entering an appropriate decree consistent with this opinion.