Longaker *v.* Longaker, Appellant.

Argued October 10, 1957. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Samuel H. High, Jr.,* for appellant.

*Francis T. Anderson,* for appellee.

OPINION BY ERVIN, J., November 12, 1957:

John Mark Longaker instituted this divorce action against his wife, Helena Dasu Longaker, alleging cruel and barbarous treatment and indignities to the person. The master recommended that the complaint be dismissed. The court below entered a decree of divorce a.v.m. on the ground of indignities. The wife appealed. After considering the evidence de novo and passing upon its weight and upon the credibility of witnesses, we have reached the independent conclusion that the decree of the court below must be affirmed on the merits.

Plaintiff, John Mark Longaker, is a native born American, a full professor of English literature at the University of Pennsylvania. Defendant, Helena Dasu Longaker, was born in Germany of White Russian ancestry. At the time of the hearing in 1954 he was 53 years of age and she was 60 years of age. The parties were married in Rome, Italy, on August 6, 1927. No children were born of this marriage but she had a son by a prior marriage. The parties lived in Philadelphia until 1939 and then moved to a house at 201 Rhyl Lane, Cynwyd, Pennsylvania, which was purchased by plaintiff and his father. The property was conveyed to the parties as tenants by the entireties on July 6, 1945. It was sold in 1954, after the institution of this action, and the proceeds were divided equally between plaintiff and defendant, her share being approximately $9,-000.00 in cash. The parties got along fairly well until about 1945, although on Thanksgiving Day evening, 1930, she struck plaintiff on the head with a mirror. From 1945 on the parties have had considerable trouble, which has become increasingly worse until the final break on October 10, 1953, when plaintiff moved to the Normandie Hotel, in Philadelphia. Plaintiff substantiated a considerable portion of his testimony by a police officer and by their neighbors, Leopold Mamolen, Esq., Dr. William A. Shannon and James F. Warren. Defendant produced no witnesses at all to corroborate her testimony, notwithstanding her own son, by a former marriage, a grown man now, lived with the parties for a number of years. He was present at some of the hearings but he did not testify for his mother. The main difficulty arose because of her quick temper and her growing addiction to alcohol. She became bored because her husband, on account of his duties at the University, could not take her out enough. She admitted, however, that he provided the funds, from his moderate

salary as a University professor, to send her to the mountains of Mexico for four months in the summer and to Florida for the winter for the last eight years before the separation. During the spring and fall, when she was home, she admitted that she started to drink because he did not take her out to have some distraction. She said: ". . . he works so hard at the University. But he can't expect me to hibernate all winter, I mean, between trips. So that is the reason I drank." She admitted placing herself in St. Luke's Hospital a half dozen times, when there was nothing wrong with her, to escape boredom, even though this extra expense placed a heavy financial burden on him. She purposely did this to hurt him and when she did not get her way, she would say: ". . . get out your check book, I go back to St. Luke's Hospital."

Defendant admitted clawing him with her fingernails innumerable times, knowing it would embarrass him because he had to appear before groups of people and students; handing him a razor blade and saying "Go ahead"; throwing pictures (or anything she could grab) at him; hitting him over the head with a flashlight in the spring of 1951 in Florida, which put him in the hospital for five days (and this was done when she had not had a drop to drink); throwing bric-a-brac through the windows of their home; that policemen brought her home and on one occasion in 1945 in Cuernavaco, Mexico, being locked up all night in the police station because she had too much to drink; going to Mr. Mamolen's home at 5:00 or 5:30 a.m. and borrowing or stealing whiskey or wine; taking a bottle of whiskey from the Liversidge home; going into the homes of three neighbors and getting whiskey; hearing bad language at the state hospital and getting a delight out of "throwing them in his case"; running out of the house at times, screaming and yelling vile language;

slapping and scratching Dr. Shannon because he said
she was drunk; calling her husband's parents Lutheran
swine (plaintiff's father was a retired Lutheran minis-
ter); that Mr. Mamolen found her husband bleeding
(after she had struck him in the head with a lamp on
August 26, 1945) and took him to Dr. Shannon; that
her husband drank less than she did during the latter
period of time they were together. He testified that for
the last six years he drank virtually nothing. She ad-
mitted that she was declared normal by the staff at
Norristown State Hospital. In 1947 she signed and is-
sued checks in her own name drawn on First National
Bank of Philadelphia where she had no account. In
September, 1950, she laid a picture of plaintiff's father
at the plaintiff's place at the breakfast table on which
she had written: "He lived and died with lies! lies and
sin! and so will you." In May, 1953 she hurled and
ruined an alarm clock. She brandished scissors and a
razor blade at the plaintiff and called the plaintiff a
"f- son of a bitch" and a "university stinker." On oc-
casions when she lost her temper, she threatened to set
fire to the house, called plaintiff vile names and told
him she would "do him in." Defendant made herself
thoroughly obnoxious in the vicinity of her residence.
Neighbors had to lock their doors to keep her out. She
was an annoyance to the Lower Merion police and to
the police in other towns where she vacationed. The
above could be amplified but it would unduly prolong
this opinion. Although she subjected her husband to
a great number of indignities and acts of cruelty she
says he should not have a divorce because he loved her.
She admitted that they never had any real reason to
quarrel. We are convinced that the plaintiff did love
the defendant and that he did everything possible to
make her happy and to give her all of the luxuries and
comforts his moderate salary would permit. She ad-

mitted he tried to stop her from drinking. Did her course of conduct cause him to suffer? Did it cause him humiliation? We believe that it did. During the summer of 1953, when she was in Mexico and he was in Philadelphia teaching in summer school to earn money with which to pay the bills, he wrote her letters expressing his love for her. But finally he wrote her: "Darling Nush: Please sober up. Otherwise I have no choice—I must get out. Lovingly, M." She replied on the same paper: "Hah-Hi, You louse. Go to hell."

We are in accord with what the court below said in this connection: "We believe that the plaintiff was stating the fact when he stated that he formerly stayed with her as long as he did because he 'hoped against hope there might be some change' for the better. Instead in September, 1953, she had hardly returned from Mexico when she assaulted him with a razor, threw a framed photograph at him and she began getting drunk again and annoying neighbors and police. Her taunting of the plaintiff when she was brought home on October 8, 1953, turned out to be the last straw. Some incident is bound to be the last straw. . . . Plaintiff loved defendant intensely and, for years he glossed over the indignities to which he was subjected. The fact that he was more loving, more patient and longer-suffering than many, or perhaps most, men of his position and stature will not bar him from obtaining relief."

We have so frequently and adequately described the kind and course of conduct necessary to establish indignities to the person as a ground for divorce that repetition is here unnecessary. Suffice it to say that a reading of this entire record has convinced us that the plaintiff has fully carried his burden.

The principal defense of the defendant is that she was an alcoholic. In *Cowher v. Cowher*, 172 Pa. Superior Ct. 98, 101, 91 A. 2d 304, this Court said: ". . .

that intoxication does not excuse improper conduct, nor is it a defense to indignities." Conduct amounting to indignities is not excused because it is the consequence of voluntary intoxication, for intoxication in such cases is no defense to the wrong: Vol. 2, §336, Marriage and Divorce in Pennsylvania, 2d Edition, Freedman.

In *Winter v. Winter*, 102 Pa. Superior Ct. 300, 156 A. 603, a divorce was granted on the ground of indignities where practically all the evidence was that respondent either was drunk or that the indignities were committed while under the influence of liquor. Intoxication was the chief basis for the allowance of the divorce in *Hoagland v. Hoagland*, 104 Pa. Superior Ct. 33, 159 A. 72.

In *Othmer v. Othmer*, 158 Pa. Superior Ct. 384, 390, 45 A. 2d 389, this Court, speaking through Judge (now President Judge) RHODES, said: "We recognize that excessive or continual drunkenness is not an excuse or justification for a course of improper conduct by one spouse toward the other, but mere drunkenness is not ground for divorce. Egolf v. Egolf, 53 Pa. Superior Ct. 254, 256." In the *Othmer* case the husband did nothing to discourage his wife from drinking but, in fact, actually encouraged it. In the present case the husband did everything possible to have his wife stop drinking.

In this case there is ample evidence of settled hate and estrangement on the part of the defendant and it is clear that she used him to the limit of her ability for the purpose of getting the utmost pleasure and entertainment out of life without making any contribution in return.

Decree affirmed.